**No. 2017-1254**

# In the United States Court of Appeals
for the
# Federal Circuit

**MOBILE TELECOMMUNICATIONS TECHNOLOGIES, LLC,**
*Plaintiff–Appellant,*

*v.*

**UNITED PARCEL SERVICE, INC.,**
*Defendant–Appellee.*

Appeal from the United States District Court
for the Northern District of Georgia,
Case No. 1:12-cv-03222-AT, Judge Amy Totenberg.

## NONCONFIDENTIAL PRINCIPAL BRIEF FOR PLAINTIFF–APPELLANT, MOBILE TELECOMMUNICATIONS TECHNOLOGIES, LLC

DANIEL R. SCARDINO
MATTHEW MURRELL
IAN E. COHEN
REED & SCARDINO LLP
301 Congress Ave., Ste. 1250
Austin, Texas 78701
512-474-2449
dscardino@reedscardino.com
*Attorneys for Plaintiff–Appellant*

February 22, 2017

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Mobile Telecommunications Technologies, LLC **v.** United Parcel Service, Inc.

Case No. 17-1254

## CERTIFICATE OF INTEREST

Counsel for the:
☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

Mobile Telecommunications Technologies, LLC

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Mobile Telecommunications Technologies, LLC | None | United Wireless Holdings, LLC |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

REED & SCARDINO LLP: Chad Ennis, Craig S. Jepson, Anthony D. Seach, Henning Schmidt, Joshua G. Jones, Dominique G. Stafford
HILL, KERTSCHER & WHARTON, LLP: Steven G. Hill, Martha L. Decker

Feb 22, 2017
Date

/s/ Daniel R. Scardino
Signature of counsel

Please Note: All questions must be answered

Daniel R. Scardino
Printed name of counsel

cc: ______

Reset Fields

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .......... i

TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... iv

STATEMENT OF RELATED CASES .......... viii

STATEMENT OF JURISDICTION .......... 1

STATEMENT OF THE ISSUES .......... 2

STATEMENT OF THE CASE .......... 3

STATEMENT OF FACTS .......... 4

I. THE ’748 PATENT .......... 4

A. Background of MTel .......... 4

B. Background of Patent-in-Suit .......... 6

C. Exemplary Independent Claim .......... 8

II. UPS’S INFRINGING DELIVERY NOTIFICATION SYSTEM .......... 9

III. UPS’S MOTION FOR JUDGMENT ON THE PLEADINGS .......... 11

SUMMARY OF ARGUMENT .......... 18

STANDARD OF REVIEW .......... 19

ARGUMENT .......... 19

I. THE ’748 PATENT IS NOT INVALID UNDER STEP ONE OF THE SECTION 101 INQUIRY BECAUSE IT IS NOT DIRECTED TO AN ABSTRACT IDEA. .......... 19

A. At Step One of the *Mayo*/*Alice* Test, a Court Must Determine Whether a Patent Is Directed at Patent-Eligible Subject Matter. .......... 20

B. The ’748 Patent Is Not Directed to an Abstract Idea Because It Claims an Improved Method Using Specific Structure and Steps

for Notifying Express Mail Recipients of the Status of Their Scheduled Delivery. ....................25

II. THE ’748 PATENT IS NOT INVALID UNDER STEP TWO OF THE SECTION 101 INQUIRY BECAUSE IT CONTAINS AN INVENTIVE CONCEPT. ....................31

A. At Step Two of the *Mayo*/*Alice* Test, a Court Must Determine Whether a Patent Contains an “Inventive Concept” that Transforms the Idea into Patentable Subject Matter. ....................32

B. The ’748 Patent Contains an Inventive Concept Because It Uses a Specific, Discrete Implementation of Specific Architecture and Steps in a Nonconventional Way. ....................36

1. The ’748 Patent contains an inventive concept at step two of the *Mayo*/*Alice* inquiry. ....................37

2. The district court ignored the non-conventional structure and arrangement of the ’748 Patent. ....................43

3. The district court improperly considered non-record evidence. ......50

III. THE DISTRICT COURT ERRED BY RESOLVING THE CASE THROUGH A RULE 12(c) MOTION BECAUSE UPS WAIVED ITS SECTION 101 DEFENSE. ....................56

CONCLUSION ....................63

CERTIFICATE OF SERVICE ....................65

CERTIFICATE OF COMPLIANCE ....................66

PRINCIPAL BRIEF ADDENDUM ....................67

**<u>CONFIDENTIAL MATERIAL OMITTED</u>**

Pursuant to Federal Circuit Rule 28(d)(2)(B), confidential material on Page 10 subject to a protective order in the district court has been omitted. That information contains a confidential, proprietary diagram of the functionality of UPS’s delivery notification system as well as a discussion of specific components within that system.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Labs of Texas, LLC v. Amazon.com Inc.*,
838 F.3d 1266 (Fed. Cir. 2016) ....................................................*passim*

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014)....................................................................*passim*

*Amdocs (Israel) Limited v. Openet Telecom, Inc.*,
841 F.3d 1288 (Fed. Cir. 2016) ....................................................*passim*

*Ancora Techs., Inc. v. Apple Inc.*,
No. 11-CV-06357-YGR, 2015 WL 5728042
(N.D. Cal. Sept. 30, 2015) ..............................................................58

*Apple, Inc. v. Ameranth, Inc.*,
842 F.3d 1229 (Fed. Cir. 2016) ....................................................40, 61

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
788 F.3d 1371 (Fed. Cir. 2015) ....................................................35, 54

*BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) ....................................................*passim*

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*,
796 F.2d 443 (Fed. Cir. 1986) ..........................................................55

*In re Bilski*,
545 F.3d 943 (Fed. Cir. 2008) ..........................................................62

*Bilski v. Kappos*,
561 U.S. 593 (2010)..........................................................................21

*Brown v. Brock*,
169 F. App'x 579 (11th Cir. 2006)..................................................50, 56

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Assoc.*,
776 F.3d 1343 (2014)........................................................................36, 54

*Diamond v. Chakrabarty*,
447 U.S. 303 (1980)....................................................................21, 22

*Diamond v. Diehr*,
450 U.S. 175 (1981)....................................................................22, 29

*Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*,
369 F.3d 1197 (11th Cir. 2004) ....................................................................51

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016) ....................................................................40

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ....................................................................*passim*

*Expanded Metal Co. v. Bradford*,
214 U.S. 366 (1909)....................................................................54, 55

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
839 F.3d 1089 (Fed. Cir. 2016) ....................................................................62, 63

*Fenner v. Cellco Partnership*,
778 F.3d 1320 (Fed. Cir. 2015) ....................................................................27

*Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs, Georgia*,
831 F.3d 1342 (11th Cir. 2016) ....................................................................50

*Genetic Techs. Ltd. v. Merial L.L.C.*,
818 F.3d 1369 (Fed. Cir. 2016) ....................................................................62

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)....................................................................31

*Interconnect Planning Corp. v. Feil*,
774 F.2d 1132 (Fed. Cir. 1985) ....................................................................55

*Johnstech Int'l Corp. v. JF Microtechnology SDN BHD*,
No. 14-CV-02864-JD, 2016 WL 6836965
(N.D. Cal. Mar. 10, 2016)....................................................................58

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
132 S. Ct. 1289 (2012)....................................................................*passim*

*McRO, Inc. v. Bandai Namco Games America Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) ....................................................................*passim*

*Mobile Telecommc'ns Techs. Corp. v. F.C.C.*,
77 F.3d 1399 (D.C. Cir. 1996)....................................................................5, 6, 39

*Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*,
139 F.3d 877 (Fed. Cir. 1998) ....................................................................54

*Mortgage Grader, Inc. v. First Choice Loan Services Inc.*,
811 F.3d 1314 (Fed. Cir. 2016) ....................................................................58, 59

*O'Reilly v. Morse*,
56 U.S. (15 How.) 62 (1854) ....................................................................31

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
467 F.3d 1355 (Fed. Cir. 2006) ....................................................................58

*Radware, Ltd. v. F5 Networks, Inc.*,
147 F. Supp. 3d 974, 982 (N.D. Cal. 2015)....................................................................58

*TDE Petroleum Data Sols., Inc., v. AKM Enter., Inc.*,
657 F. App'x 991 (Fed. Cir. 2016) ....................................................................39

*Thomas v. Sec'y, Florida Dep't of Corr.*,
644 F. App'x 887 (11th Cir. 2016)....................................................................50, 51

*Thought, Inc. v. Oracle Corp.*,
No. 12-CV-05601-WHO, 2015 WL 5834064
(N.D. Cal. Oct. 7, 2015)....................................................................58

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
837 F.2d 1044 (Fed. Cir. 1988) ....................................................................55

*Univ. of W. Virginia Bd. of Trustees v. VanVoorhies*,
278 F.3d 1288 (Fed. Cir. 2002) ....................................................................19

**Statutes**

28 U.S.C. § 1295(a)(1)....................................................................1

28 U.S.C. § 1338(a) ....................................................................1

35 U.S.C. § 100(b) ....................................................................48

35 U.S.C. § 101 .......... *passim*

35 U.S.C. § 271 .......... 3

**Rules**

Fed. R. Civ. P. 12(b)(6) .......... 62

Fed. R. Civ. P. 12(c) .......... *passim*

Fed. R. Civ. P. 12(d) .......... 56

Fed. R. Evid. 201 .......... 50, 52, 62

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant Mobile Telecommunications Technologies, LLC provides as follows:

(a) There has been no other appeals in this case.

(b) Appellant knows of no other cases that are related to this matter.

## STATEMENT OF JURISDICTION

The case below was a patent infringement action in the Northern District of Georgia, which had jurisdiction under 28 U.S.C. § 1338(a). The court granted Appellee UPS's Motion for Judgment on the Pleadings on March 24, 2016, Appx6, and then denied Appellant MTel's Motion for Reconsideration and granted judgment in favor of UPS on October 21, 2016. Appx39, Appx40. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in determining that the patent-at-issue was directed to an abstract idea by stripping away the limitations in the specification and claims to find the patent's "beating heart" instead of analyzing the claimed method in the context of the specification.

2. Whether the district court erred in determining that the patent-at-issue lacked an inventive concept by assessing the patentability of the invention in view of the present-day state of the art, ignoring context provided by the specification and specific claim limitations, and impermissibly resolving disputed factual matters regarding the state of the art by exceeding the permissible scope of a Section 101 inquiry.

3. Whether the district court erred by deciding this case on a Rule 12(c) motion when the defendant had not asserted a Section 101 defense at any time during the three-year period between its Answer and the Motion, including no assertion of the defense in its discovery responses or expert reports.

## STATEMENT OF THE CASE

Plaintiff-Appellant Mobile Telecommunications Technologies, LLC ("MTel") filed an Original Complaint on September 14, 2012, alleging that Defendant-Appellee United Parcel Service, Inc. ("UPS") infringed U.S Patent No. 5,786,748 (the "'748 Patent") pursuant to 35 U.S.C. § 271, by offering "package tracking services that provide information on the status of a shipment via Short Message Service." Appx1562, Appx1565.

UPS filed a Motion for Judgment on the Pleadings on July 29, 2015, asserting that the '748 Patent was invalid pursuant to 35 U.S.C. § 101. Appx50. The district court granted judgment on the pleadings on March 24, 2016, finding the '748 Patent invalid under Section 101. Appx6.

MTel filed a Motion for Reconsideration on April 21, 2016, alleging, *inter alia*, that the district court committed error by misapplying the law, failing to consider the record evidence, and employing hindsight bias. Appx272-277; Appx287-294. The district court denied that motion and granted judgment invalidating the Patent on October 21, 2016. Appx39, Appx40. MTel filed a timely notice of appeal on November 18, 2016. Appx1572-1574.

## STATEMENT OF FACTS

## I. THE '748 PATENT

### A. Background of MTel

Plaintiff-Appellant Mobile Telecommunications Technologies, LLC ("MTel") is the intellectual property licensing division of United Wireless Holdings, Inc. ("United Wireless"), which is the successor-in-interest to SkyTel Communications, Inc. (formerly Mobile Telecommunications Technologies Corporation ("MTel Corp.")). MTel Corp. was a publically traded company that operated a nationwide, commercial, wireless data network under the brand name "SkyTel." Appx980-983. In 1999, MTel Corp. was acquired by MCI for $1.8 billion dollars. Appx995-996; Appx999-1000; Appx1003-1008. MCI was then merged into WorldCom, which soon thereafter filed for bankruptcy, taking SkyTel with it. After years in bankruptcy administration, MCI was purchased and the SkyTel network and operations were spun out by the buyer. In 2008, the SkyTel network and all associated assets, including intellectual property, were acquired by United Wireless, the corporate parent and owner of MTel. Appx1584-1585. Leading up to and after the acquisition by United Wireless, the SkyTel network was one of the largest providers of wireless data messaging services to the Department of Defense and also provided wireless data messaging services to IBM, Chase, Google, Intel, and Fed Ex. Appx945-947. The network continues to operate today.

The SkyTel wireless data network launched on September 19, 1995. Appx1579-1582. It was the nation's first advanced, two-way wireless messaging network. While initially dubbed a "two-way paging" network in the lexicon of the day, the data-only capabilities of the SkyTel network are mirrored today by many wireless data networks. Indeed, the SkyTel network allowed its customers to exchange messages, receive email, and access the Internet. Appx1267.

The ubiquity of wireless data today is technologically and functionally rooted in the development and operation of the SkyTel network. The SkyTel wireless data solution was so advanced that the Federal Communications Commission ("FCC") awarded MTel Corp. a Pioneer's Preference "as a reward for developing technology making it possible to transmit information through the airwaves much faster than had formerly been possible." *Mobile Telecommc'ns Techs. Corp. v. F.C.C.*, 77 F.3d 1399, 1402 (D.C. Cir. 1996) (rejecting a challenge to the Pioneer's Preference Award granted to MTel Corp. and noting that the award was granted to "reward the development of new and innovative communication services"); *see also id.* at 1411 (Edwards, J., dissenting in part & concurring in part) (detailing the history of the Pioneer's Preference Award granted

to MTel Corp.).[1] The FCC thus lauded MTel for “solv[ing] significant technical engineering problems” that had “stumped its competitors.” 77 F.3d at 1411.

**B. Background of Patent-in-Suit**

At the time SkyTel made two-way, nationwide, wireless data transmission a reality in 1995-1996, a technical distinction existed between cellular and paging network technology. *See, e.g.*, Appx851-855; Appx881-882. That distinction was a consequence of the different types of connections and services offered: voice communications were carried over cellular networks because at that time it was connection-oriented, meaning that both parties were connected through the network simultaneously, thus permitting real-time voice communications. *Id.* In contrast, SkyTel’s paging network transmitted wireless page messages and was “connectionless,” meaning that the receiving party did not have to be connected to the transmitting party through the network at the same time. Appx881:14-23.

In addition to the connectionless network itself, SkyTel was also developing uses for the network. The patent-at-issue in this case was one of an array of patents that were the result of that development. The extensive portfolio begins with patents focused on the fundamental technology needed for connectionless wireless data transfer to mobile devices. *See, e.g.*, U.S. Pat. No. 5,659,891, “Multicarrier Techniques in Bandlimited Channels,” (Appx884-898); U.S. Pat. No.

[1] MTel Corp. was represented in that case by, among others, Judge Timothy B. Dyk.

5,396,228 “Methods and Apparatus for Compressing and Decompressing Paging Data,” (Appx900-917). The portfolio extends to market-specific applications of that technology, including the ’748 Patent.

Claiming priority to a provisional patent filed on February 29, 1996, the ’748 Patent is directed to a method to provide wireless shipping status notifications only upon the occurrence of a specific sequence of events, using specific technology and architecture. Appx4-5; Appx759. The ’748 Patent marked an improvement over the prior art, in part, through its use of the claimed “wireless page messages” by “for example, Skytel, a global paging service provided by Mtel.” Appx4 at 2:18-20. As the Patent describes in the Background of the Art section, previous notification options employed by express mail services required calling into a telephone bank or manually checking an Internet webpage. Appx4 at 1:23-27. The ’748 Patent improved that technology by connecting a paging operations center with an express mail tracking service, sharing information between those previously unconnected systems, and providing a real-time, automated wireless notification solution: “It is accordingly an objective of the present invention to provide a method and system for giving prompt notifications to concerned parties of the actual delivery of express mailings to intended addresses.” Appx4 at 1:33-36.

### C. Exemplary Independent Claim

The ’748 Patent contains one independent claim and two dependent claims. Claim 1 reads:

> 1. A method for providing notification of an express mail delivery to an addressee thereof, comprising the steps of:
>
> sending to an express mail tracking service an ID number assigned to an express mailing and a page number of a delivery notification recipient;
>
> relaying the ID, page number, and an appointed time to a paging operations center;
>
> providing a first indication to the paging operations center that the express mailing has been delivered to the addressee;
>
> providing a second indication to the paging operations center that the express mailing has not been delivered to the addressee by the appointed time;
>
> transmitting, responsive to the first indication, a wireless page message to the recipient as notification of the express mailing delivery; and
>
> transmitting, responsive to the second indication, a wireless page message to the recipient notifying recipient that the express mailing has not been delivered by the appointed time.

The Claim’s method steps are divided into operations at an express mail tracking service, which receives tracking information about the express mailing and a page number for the recipient; and a paging operations center, which after receiving the linked tracking and contact information and status indications from

the express mail tracking service, transmits wireless page messages to the recipient as notifications of the delivery status of the express mailing. In other words, the claim requires a particular type of notification for a particular activity only upon a particular sequence of events, all using a peculiar communication technology—paging—that a person of ordinary skill in the art would recognize excluded every other known communication technique, including written, voice or any other natural forms of communication. These requirements result in a narrow claim with a very specific purpose at the time of the invention in 1996 of leveraging the benefits of connectionless wireless transmission technology in connection with express mail delivery services.

## II. UPS'S INFRINGING DELIVERY NOTIFICATION SYSTEM

MTel alleged infringement of the '748 Patent based on UPS's automated delivery notification systems, which connect its express mail tracking service to wireless data network providers and transmits wireless notification messages to wireless devices. The architecture of UPS's notification systems, which was developed over many years, was implemented to save UPS millions of dollars that would otherwise go to call center operations. Appx1626-1639. The UPS notification system message flow and architecture is represented by this diagram:

[redacted]

Appx1591 (diagram is confidential).

The architecture of UPS's notification systems includes each of the structural elements required in the '748 Patent and those structures perform each of the method steps. For example, UPS's [redacted] Appx783-784. UPS's [redacted] receives and processes the delivery status data sent by [redacted], and generates wireless messages for transmission through the [redacted] email server and the [redacted] to UPS customers. Appx794.

MATERIAL ON THIS PAGE HAS BEEN REDACTED

## III. UPS'S MOTION FOR JUDGMENT ON THE PLEADINGS

MTel filed suit on September 14, 2012. Appx1562, Appx1570-1571. On February 8, 2013, UPS served its invalidity contentions, which it later amended on April 14, 2014. Neither the original nor the amended contentions asserted a Section 101 defense. *See* Appx226-240; Appx131-153. On March 13, 2014, MTel sought via contention interrogatory "the factual and legal basis" for UPS's assertions of invalidity.[2] UPS's April 17, 2014 interrogatory response did not assert invalidity under Section 101. Appx126-127; Appx1683.

When *Alice* issued on June 19, 2014, UPS neither filed a Section 101 motion nor amended its response to MTel's contention interrogatory or its Invalidity Contentions to include Section 101 as a basis of invalidity. *See* Appx125-128; Appx131-153; Appx226-240; Appx1683. On June 2, 2014, fact discovery closed. Appx1543. On July 2, 2014, UPS served its expert report on invalidity, which did not assert invalidity under Section 101. Appx155-158; Appx160-163 (Aug. 11, 2014 rebuttal report). On October 30, 2014—the court-scheduled deadline for dispositive motions—UPS moved for summary judgment of noninfringement. Appx1544; Appx439-440; *see also* Appx524-525; Appx532-554. It did not assert Section 101 invalidity. *See* Appx442-486.

---

[2] The *Markman* Order issued on March 17, 2014. Appx1504-1508. In it, the district court adopted UPS's proposed constructions for "express mail tracking service" and "paging operations center." *See* Appx1514-1542.

In its summary judgment motion, UPS argued that the patent claims were narrow and limited to only a slim subset of wireless data transmissions that excluded the SMS and wireless email transmissions sent by UPS and that excluded data sent over a cellular connection. Appx473 ("wireless page messages can only be used to send a short, limited message to a recipient who may be able to respond in a limited manner or may not be able to respond at all"); Appx475 ("cellular networks are substantially more robust than paging networks and can handle cellular phone calls, SMS messages, and data traffic"); Appx1404 ("UPS contends that the scope of the plain and ordinary meaning of the term "wireless page message" excludes email and SMS text messages."); *see also* Appx554-571 (rebutting same). As UPS asserted, "a 'page' is a conventional page, and UPS's email and SMS text notifications are not conventional pages – a simple, and irrefutable, premise." Appx1071, Appx1079.

On July 8, 2015, the court-appointed Special Master issued his Report and Recommendation that the Court should deny UPS's Motion for Summary Judgment as to literal infringement. Appx1397-1400; Appx1418-1433. In his ruling, the Special Master pointed out that a factual dispute existed regarding whether the claims covered the SMS and wireless email notifications provided by UPS to its customers. *See* Appx1400-1412. The Special Master agreed with MTel's assertion that the claims did not have the hyper-narrow scope urged by

UPS and should instead "be given the full scope of its plain and ordinary meaning, which broadly includes data sent to mobile devices, without limitation to specific types of data." Appx1409-1410. In support, the Special Master specifically noted the technological significance of the Patent's express reference to the "SkyTel" wireless data network:

> [B]y listing Skytel as an example of the paging service in which the claimed method operates, the '748 patent specification supports a broad reading of the plain and ordinary meaning of "wireless page message" by a person of ordinary skill in the art. . . . MTel has produced substantial extrinsic evidence that does not conflict with the intrinsic evidence and shows that the Skytel paging service referenced by the '748 patent specification provided and was being developed to provide a wide variety of data formats to its page recipients, including email and general two-way high speed data communications.

Appx1411; *see also* Appx1413-1417.

At that point in the case, the summary judgment motions had been resolved and the case was mere months away from trial. *See* Local Rule 16.4.A of the Local Rules of the Northern District of Georgia ("The parties shall prepare and sign . . . a proposed consolidated pretrial order to be filed with the clerk no later than thirty (30) days after . . . entry of the court's ruling on any pending motions for summary judgment").

On July 29, 2014—the last day on which objections to the Special Master's Report and Recommendation were due, long after the close of discovery and nearly

eight months after the dispositive motion deadline—UPS filed a motion for judgment on the pleadings asserting invalidity under Section 101. Appx41-42. In its motion, UPS reversed its summary judgment assertion that the claims were narrow, and specifically argued that the claims were extremely broad, covering every conceivable form of communication. In other words, for purposes of UPS's summary judgment motion, the district court should have understood that the '748 Patent has a limited focus that specifically excludes SMS, email, and any other data communicated over a cellular connection. But for purposes of UPS's Motion for Judgment on the Pleadings, the court should have understood that the '748 Patent broadly encompasses the general concept of notifications, without limitation.

In its new theory of the Patent, at step one of the *Alice*/*Mayo* test, UPS asserted that "the 748 Patent is directed to nothing more than notifying people of a delay and ultimate delivery of an express mailing." Appx58. According to UPS, "The basic idea claimed in the 748 Patent could as easily be performed without a computer by notifying the recipient by phone, letter, telegram, or messenger." Appx58. Thus, UPS urged the district court to overlook virtually every structural claim limitation in the method for providing a notification, and instead view the Patent as directed only to the resulting notification, itself.

UPS's analysis at step two of the *Alice*/*Mayo* test was equally dismissive of the actual structure of the claims. UPS asserted that "[t]he claims recite nothing more than the abstract idea itself, coupled with generic computer components or field of use limitations." Appx64. And according to UPS, the claimed "paging operations center" and "express mail tracking service" "could be met by human beings processing paper messages." Appx65.

Furthermore, UPS mischaracterized MTel and its technical expert's reading of the Patent, asserting that MTel endeavored "to rewrite 'wireless page message' to mean 'wireless data message.'" In fact, MTel had argued to the contrary: that the "wireless page message" limitation referred to a specific type of data transmitted wirelessly over a connectionless (as opposed to a connection-oriented) framework. *Compare* Appx66 ("if Mtel is allowed to rewrite 'wireless page message' to mean 'wireless data message' as explained in UPS's Motion for Summary Judgment (D.E. 95), this limitation is wholly generic"), *with* Appx541 ("a 'page' message was understood by a POSITA as an umbrella term for the transmission of data to mobile devices over a connectionless framework (as opposed to voice transmissions, which occur over a connection-oriented framework)").

The district court granted UPS's Motion. Rather than focus on the specific claim limitations or steps of the method, however, the court searched for "the

beating heart of the patent, its animating function." Appx12. That approach led the district court to strip the limitations from the claims, reducing the invention to "notifying customers that their package is late, or that it has arrived." Appx16. The district court then held that MTel "patented a method of delivery notification that is the equivalent of a method implemented 'through a computer' or 'over the internet.'" Appx22. In its Order on MTel's Motion for Reconsideration, the district court redoubled its abstracted perception of the claims, confirming that "The [prior] holding that the claim elements were the rough equivalent of 'merely generic computers performing routine computer functions' *was* the Court's holding." Appx33. That reduction ignored the Patent's stated purpose, which is to improve on the prior-art notifications delivered "through a computer" or "over the internet." Indeed, the written description explains that its objective was to overcome the problem of having to check delivery status on the Internet. Appx4 at 1:23-36.

In its two orders on the Section 101 challenge, the district court did not mention the Special Master's Report and Recommendation regarding the scope and plain meaning of the "wireless page message" limitation in the claims. As the Special Master noted, UPS's position was that a wireless page message did not include certain of the accused instrumentalities (SMS or wireless email notifications), but MTel's position was that a wireless page message included any

wireless data message sent over a connectionless framework, such as that utilized in the SkyTel network disclosed in the Patent. Appx1404-1407. The Special Master expressly declined to resolve the dispute, but recommended denying UPS's noninfringement MSJ because he found that a reasonable jury could determine that SMS and wireless email notifications were "wireless page messages." *See id.*; *see also* Appx1407-1413. Although the district court did not address the meaning of "wireless page message" in the original order, remarkably, in the reconsideration order, the district court embraced MTel's position and construed "wireless page message" as "data sent wirelessly, rather than data sent over a 'connection-oriented framework' like a cell phone voice call." Appx34 at n.2. That construction, given for the first time in the order on the motion for reconsideration, should have changed the Section 101 analysis because it narrows the scope of the claims (by excluding connection-oriented communications) and cuts against the district court's prior finding that the claims are so broad as to cover any form of communication through computers or over the Internet.

The district court also relied on extra-record evidence and looked past the state of the art at the time of the '748 Patent's invention, instead considering the ubiquity of certain accused instrumentalities (SMS and wireless email) today to determine that the Patent was invalid. Appx24 (invalidating the patent because it covered "two of the most popular methods of communication currently available in

SMS text messages and e-mail"); *see also* Appx287-294; Appx316-324. Finally, the district court took "judicial notice" that many of the key limitations in the claims were "well known" or "generic" but did not cite anything, record evidence or otherwise, to support such conclusions and did not make clear whether it meant that the claim limitations were well-known at the time of the invention or had become commonplace thereafter via the evolution of communications technologies. Appx34.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's finding of unpatentability under Section 101 because the '748 Patent is neither directed to an abstract idea nor fails to contain an inventive concept that cabins its subject matter within the allowable categories in Section 101. The district court made several errors in arriving at its conclusion. At step one of the *Alice*/*Mayo* test, the district court ignored the Supreme Court's frequent admonishment against abstracting the claims and this Court's emphasis on an approach that tethers the idea to the specification and claims in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016), and *McRO, Inc. v. Bandai Namco Games America Inc.*, 837 F.3d 1299 (Fed. Cir. 2016). At step two of the *Alice*/*Mayo* test, the district court continued its abstracted analysis, stripping several critical limitations away from the claims and misreading this Court's decision in *BASCOM Global Internet Services, Inc. v.*

*AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016), and *Amdocs (Israel) Limited v. Openet Telecom, Inc.*, 841 F.3d 1288 (Fed. Cir. 2016). To arrive at its conclusion, the district court compounded its error by entertaining a Rule 12(c) Motion despite UPS's waiver of its Section 101 defense and exceeded the bounds of permissible evidence by ignoring facts in the record and assuming facts beyond the record, at best impermissibly resolving factual disputes about the state of the art at the time of the invention on a Rule 12 motion.

## STANDARD OF REVIEW

Substantive decisions regarding patentability under 35 U.S.C. § 101 are reviewed *de novo*. *See BASCOM*, 827 F.3d at 1347. Procedural issues regarding the timing of UPS's Motion for Judgment on the Pleading are reviewed for an abuse of discretion. *See Univ. of W. Virginia Bd. of Trustees v. VanVoorhies*, 278 F.3d 1288, 1295 (Fed. Cir. 2002).

## ARGUMENT

### I. THE '748 PATENT IS NOT INVALID UNDER STEP ONE OF THE SECTION 101 INQUIRY BECAUSE IT IS NOT DIRECTED TO AN ABSTRACT IDEA.

To determine eligibility under Section 101, the court must determine "whether the claims at issue are directed to one of the patent-ineligible concepts." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). If the patent is directed to a patent-ineligible concept, then the court must determine whether "the elements of each claim both individually and 'as an ordered combination' . . .

'transform the nature of the claim' into a patent-eligible application.'" *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1296-97 (2012)).

The district court erred at both steps. First, it determined that the patent was directed to ineligible subject matter despite the patent's claim of a specific method using specific communication architecture to achieve a result and its demonstration that it is directed to an improvement within the art itself. In reaching its conclusion, the district court misread and misapplied this Court's decisions in *Enfish*, 822 F.3d 1327, and *McRO*, 837 F.3d 1299. Second, the district court determined that the patent failed to transform the invention into patent-eligible subject matter despite the claims' reliance on unique components that merged the unrelated fields of express mail tracking, notification and wireless page message transmission technology. The district court at step two misread and misapplied this Court's decision in *BASCOM*, 827 F.3d 1341. The Court should reverse the district court's determination that the '748 Patent is ineligible under Section 101.

### A. At Step One of the *Mayo/Alice* Test, a Court Must Determine Whether a Patent Is Directed at Patent-Eligible Subject Matter.

At step one of the *Alice*/*Mayo* test, a court must determine whether a patent is directed to an abstract idea. This court's recent case law has elucidated the step one inquiry: that inquiry *cannot* be abstracted from the patent and its specification, and it must examine the four corners of the patent, in the context of the specific

claims. Such an analysis here demonstrates that the ’748 Patent is not directed at an abstract idea because it seeks to improve the art of express mail delivery status notifications by claiming a method of delivery notification that uses a specific, wireless transmission technology.[3]

As the Supreme Court has noted, “Section 101 [of the Patent Act] . . . specifies four independent categories of inventions or discoveries that are eligible for protection: processes, machines, manufactures, and compositions of matter.” *Bilski v. Kappos*, 561 U.S. 593, 601 (2010) (ellipsis in original). Noting that those categories be given “broad scope,” the Supreme Court has created three categories of unpatentable subject matter: “laws of nature, physical phenomena, and abstract ideas.” *Diamond v. Chakrabarty*, 447 U.S. 303, 308-09 (1980). The abstract idea exception is meant to prevent the claiming of a pure idea: “A principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right.” *Alice*, 134 S. Ct. at 2355 (internal quotation marks omitted) (quoting *Le Roy v. Tatham*, 55 U.S. (14 How.) 156, 175 (1852)).

However, the Supreme Court has repeatedly warned that the abstract idea inquiry is not a license to indiscriminately invalidate patents:

[3] The district court did not address the asserted dependent claims but still invalidated the entire patent.

> [T]oo broad an interpretation of this exclusionary principle could eviscerate patent law. For all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas. Thus, in *Diehr* the Court pointed out that "a process is not unpatentable simply because it contains a law of nature or a mathematical algorithm." It added that "an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection."

*Mayo*, 132 S. Ct. at 1293-94 (citation omitted) (quoting *Diamond v. Diehr*, 450 U.S. 175, 187 (1981)).

That the step one inquiry should be a coarse filter reflects Congressional intent that the 1952 Patent Act cover "anything under the sun that is made by man." *See Chakrabarty*, 447 U.S. at 308-09. Accordingly, the exceptions to patentability must be narrow lest they "swallow all of patent law." *See Alice*, 134 S. Ct. at 2354; *accord Mayo*, 132 S. Ct. at 1293 ("too broad an interpretation of this exclusionary principle could eviscerate patent law"); *Diehr*, 450 U.S. at 188-89 & n.12 ("if carried to its extreme, [such analysis would] make all inventions unpatentable").

Despite the importance of limiting the Section 101 exceptions, the Supreme Court has not provided a standard for an "abstract idea," and this Court recently noted "that it is difficult to fashion a workable definition" of the term. *Amdocs*, 841 F.3d at 1294. Instead, the approach has been based on analogous reasoning,

leading courts to compare a claim to those that have been previously invalidated. *See id.*; *Enfish*, 822 F.3d at 1334.

Unfortunately, this approach has led district courts to abstract a patent's claims—contrary to the Supreme Court's repeated warnings—to find an unpatentable abstract idea at the heart of a patent that is altogether removed from the claims and the specification. In *Enfish*, this Court rejected that approach, noting that the patent-at-issue should not be analyzed at "a high level of abstraction and untethered from the language of the claims." 822 F.3d at 1337. *Enfish* notes that the step one inquiry must be substantive vis-à-vis a pro forma conclusion that *every* patent is directed at an abstract idea. *Id.* at 1335.

*Enfish* demarcates patent claims that are directed to an improvement in an existing art and patent claims that are directed to an abstract idea where the art is merely used as a tool. *Id.* at 1335-36. Thus, under *Enfish*, if the patent claim is "directed to" solving a problem within an art, then it is not an abstract idea:

> The "directed to" inquiry . . . cannot simply ask whether the claims *involve* a patent ineligible concept. . . . Rather, the "directed to" inquiry applies a stage-one filter to claims, considered *in light of the specification*, based on "whether their *character as a whole* is directed to excluded subject matter."

*Id.* (citation omitted) (emphasis added) (quoting *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)).

The specification plays a critical role in the analysis by establishing the technological context of the claims, defining the technical problem addressed by the patent, and describing the benefits over the prior art. *Id.* at 1337 ("[T]hat the claims are directed to an improvement of an existing technology is bolstered by *the specification's teachings* that the claimed invention achieves other benefits over conventional databases." (emphasis added)).

Further, a court must consider all elements of the claim *as a whole* instead of over-generalizing the invention to eliminate critical elements. *Id.* ("The district court oversimplified the . . . components of the claims and *downplayed the invention's benefits*." (emphasis added)). Indeed, this Court reiterated that approach in *McRO*: "We have previously cautioned that courts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims." 837 F.3d at 1313 (quoting *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)).

Finally, this Court has approached the abstract idea inquiry at step one by distinguishing between claims directed to a result or effect itself rather than claims focused on a means or method for producing a result. *Id.* at 1314 (Fed. Cir. 2016) ("We therefore look to whether the claims in these patents focus on a specific means or method that improves the relevant technology or are instead directed to a

result or effect that itself is the abstract idea and merely invoke generic processes and machinery.”).

### B. The ’748 Patent Is Not Directed to an Abstract Idea Because It Claims an Improved Method Using Specific Structure and Steps for Notifying Express Mail Recipients of the Status of Their Scheduled Delivery.

The ’748 Patent is directed to an improvement to the then-existing options to provide notification of express mail delivery status. The Patent describes the previous notification options in the art as either manually “calling an 800 telephone number” or checking an Internet webpage. Appx4 at 1:23-27. As the ’748 Patent explains, those options “require[d] action by persons, typically mailers, to determine whether critical express mailings have been successfully delivered to addressees.” Appx4 at 1:27-30. The claimed notification methods combined express mail tracking services and wireless paging technology to create a new and improved method of communicating delivery status information to customers, without the type of action previously required by such persons. Prior to the ’748 Patent, express mail tracking and paging notification technology were understood as discrete technologies without any functional overlap.

The ’748 Patent was not merely directed to the result or effect of a “proactive” or “automatic” notification that did not require the customer to call into a customer service call center or check a webpage. The claim was a particular method of achieving that result by combining the functionality of an express mail

tracking service and a paging operations center to transmit two types of wireless page messages. Indeed, the ’748 Patent is notable for the specific architecture and process flow it demands through its invocation of specialized communications equipment and tracking systems and a sequence of inputs and outputs to and from those components. The Patent requires, for example, an “express mail tracking service” and a “paging operations center”; that an ID number for a tracked mailing and a page number for the notification recipient be input into the express mail tracking service; that the ID number, page number, an appointed time, a first indication and a second indication be input into the paging operations center; that the paging operations center output two wireless page messages; and that the wireless page messages each contain different specific content. Appx5 at 4:11-29.

Further, the face of the patent demonstrates the importance of MTel Corp.’s proprietary SkyTel wireless data network to an understanding of the invention. The named inventors, John E. Nikolic and Patrick E. Burns, were both employees of MTel Corp. and the invention was assigned to MTel Corp. *See* Appx1; Appx172-175; Appx178-181. The exemplary paging network disclosed in the patent—the SkyTel network—was owned and operated by MTel Corp. Appx1673. MTel Corp. did not operate an express mail tracking service, however, as those were operated by express mail delivery companies who, in turn, did not operate their own wireless paging services. The patent combines wireless paging technology

and the express package delivery art to solve a unique problem in the latter art: existing communications technologies were insufficient to meet the demands of delivery companies and their customers because, in part, they relied on notification techniques that required the customer to dial into a call center or manually check delivery status on a webpage. Appx4 at 1:33-36. Accordingly, the inventors combined MTel's proprietary network with the express package delivery art to solve that problem.

Instead of tethering the patent to its specification and the claims, the district court ignored the specificity required by the claim language in violation of *Alice* and *Enfish*. The root cause of these errors was the same: by its own admission, the district court looked for the patent's "beating heart," attenuating and stripping away the patent's limitations. *See* Appx12 ("The trick is to try and detect the beating heart of the patent, its animating function."). The district court's Order begins with a statement that the entire inquiry itself is abstract: "This patent case presents *the abstract question* of what is meant by the word "abstract." Appx6 (emphasis added).[4]

[4] Contrary to the district court's assertion, determining a claim's scope in connection with a Section 101 inquiry is *not* a purely intellectual exercise of grappling with the inherent imprecision of describing technological matters with language. *Fenner v. Cellco Partnership*, 778 F.3d 1320, 1323 (Fed. Cir. 2015) ("Words are symbols, linguistic embodiments of information sought to be communicated, and as such, can be imperfect at representing their subject.").

This abstract approach to the step one inquiry also led the district court to commit an error unique to method claims when it failed to consider the steps of the method as an ordered combination:

> Whether at step one or step two of the *Alice* test, in determining the patentability of a method, a court *must look to the claims as an ordered combination*, without ignoring the requirements of the individual steps. The specific, claimed features of these rules allow for the improvement realized by the invention.

*McRO*, 837 F.3d at 1313 (citations omitted) (emphasis added).[5]

According to the district court, the ’748 Patent’s “beating heart” and “one animating goal” was “notifying customers that their package is late, or that it has arrived.” Appx16. To arrive at that conclusion, however, the district court recast the ’748 Patent as claiming the result *itself* by stripping the Patent of its specific structural requirements and overlooking the ordered combination of the distinct steps of the method. The Patent does not claim merely “a notification.” Instead, “[w]hat is claimed is . . . [a] method *for providing notification*.” Appx5 at 4:8-9 (emphasis added).

---

[5] In its original order, the district court noted that “the only time that in recent cases that courts have upheld a method patent was when the overarching aim of the patent was to solve a specific technical problem, not to implement an abstract idea.” Appx20. Despite MTel informing the district court that *McRO* seemed to contradict that point, the court determined that the case was “inapposite” because it involved 3-D animation. Appx39.

The district court's stated goal—finding the Patent's "beating heart"—reduced the patent to the *result* of the claimed method steps, when the patent instead claims a particular method for *achieving that result*. Indeed, the district court openly admitted that its analysis focused on the result of the method vis-à-vis the method itself: "The fact that MTel has automated the process of delivery notification *in a particular way* does not . . . render the ultimate idea behind its patent different or unique from the general idea itself." Appx16 (emphasis added). This is error. The *McRO* court delineated the former from the latter, noting that patents that claim *a method for producing a certain result* claim patentable subject matter under Section 101: "A patent may issue 'for the means or method of producing a certain result, or effect, and not for the result or effect produced.'" *McRO*, 837 F.3d at 1314 (citations omitted) (quoting *Diehr*, 450 U.S. at 182 n.7). The '748 Patent does precisely that which *McRO* and *Diehr* protect: its ordered combination in the context of the individual steps claims a *method of notification* vis-à-vis claiming only *the result* of that method.

The *McRO* court also explained that claiming only *the result or effect* of a process or method is problematic in that it triggers concerns of preemption by "monopliz[ing] 'the basic tools of scientific and technological work." *Id*. Thus, the abstract idea exception is often triggered "where 'it matters not by what process

or machinery the result is accomplished." *Id.* (quoting *O'Reilly v. Morse*, 56 U.S. (15 How.) 62, 113 (1854)).

Here, however, the patented method could not be performed by *any process* because the '748 Patent's claims require a specific sequence of inputs, outputs, and results in a wireless page message notification. Further, the method could not be performed on *any machinery* because the '748 Patent requires specific components, including an express mail tracking service and a paging operations center that transmit wireless page messages. In fact, the following currently available notification methods would not be preempted by claims that are limited to paging operations centers and wireless page messages: mail, telegram, telephone line, ISDN, cable, optical mesh networks, leaving a note at a house, and communicating over the Internet. Finding that a claim requiring wireless page messages preempts *all* forms of express mail delivery notification, which is what the district court did here, is like finding that a method of using Phillips-head screws is directed to the abstract idea of fastening materials together.[6]

The district court cited the preemption concern, stating, "it is hard to understand how a 'wireless page message' – like a 'SMS message or email message' – sent over a 'connectionless framework' – like a cellular network or the

[6] Henry Frank Phillips was awarded multiple patents on his screw head design, including U.S. Patent Nos. 2,046,343, 2,046,837, 2,046,838, 2,046,839, and 2,046,840.

internet – is anything but generic." Appx23; *see also infra* Part II.B.3 (discussing this error in more detail). However, the commercial success of a patented technology is not a strike against its patentability but rather a measure of a patent's validity. *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966) (identifying the secondary considerations of nonobviousness). The Phillips screw example illuminates the point: *Morse*, *Mayo*, *Alice*, *McRO*, and the like would not justify invalidating Phillips' patents because of the success of his screw-head design; likewise, they do not justify invalidating the '748 Patent because of the eventual ubiquity of Skytel's *own* paging network technology that uses a connectionless framework. It was error for the district court to find that the Patent was directed to an impermissible abstract idea, and that error alone requires reversal.

## II. THE '748 PATENT IS NOT INVALID UNDER STEP TWO OF THE SECTION 101 INQUIRY BECAUSE IT CONTAINS AN INVENTIVE CONCEPT.

At step two of the *Alice*/*Mayo* test, a court must determine whether a claim contains an "inventive concept" that transforms the abstract idea into patent-eligible subject-matter. The assessment of the inventive concept must focus on the specific, discrete implementation of the invention, including not only the claim elements, individually, but their collective arrangement. Moreover, that assessment of inventiveness must be made with reference to the technology at the time of the patent's filing—not today. Here, the district court erred in focusing at

step two only on the abstract "beating heart" of the invention; failing to consider the specific, discrete claim elements; and relying upon extra-record evidence to determine that the claim limitations were not sufficiently inventive to confer patentability. When the '748 Patent is properly assessed in light of the record on what technology existed at the time of the invention, the Patent's validity is clear: the claimed structural elements are both individually and collectively non-generic and non-conventional.

### A. At Step Two of the *Mayo*/*Alice* Test, a Court Must Determine Whether a Patent Contains an "Inventive Concept" that Transforms the Idea into Patentable Subject Matter.

Even if a patent is aimed at an abstract idea, it is patentable if "it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357 (brackets omitted) (quoting *Mayo*, 132 S. Ct. at 1294, 1298). Thus, "[a] claim that recites an abstract idea must include 'additional features' to ensure 'that the claim is more than a drafting effort designed to monopolize the abstract idea," which is to say that the patent must do more than claim the abstract idea and then "add[] the words 'apply it.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1294, 1297). In short, if a patent claims an abstract idea, then "the claim ha[s] to supply a 'new and useful' application of the idea in order to be patent eligible." *Id.* (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

This Court's decision in *BASCOM*, 827 F.3d 1341, elucidates a fundamental principal undergirding the *Alice/Mayo* step two analysis: district courts must focus on the specific structure and architectural limitations in the claims. In *BASCOM*, this Court examined a patent that sought to address a problem specific to web browsing. *Id.* at 1344. Existent content-filtering techniques had significant drawbacks because, *inter alia*, local software was easily manipulated and server software was too rigid. *Id.* at 1343-44. The patent sought to combine those techniques—while avoiding their respective downfalls—by making the server-side filter adaptable by individual users.

The district court found that combination to lack an inventive concept sufficient to transform content filtering into a patentable idea. This Court disagreed. *Id.* at 1341, 1349-50. Rather than view the patent in the abstract as the district court did—that is, that the patent only claimed content filtering—the Court focused on the specific structural limitations of the claims:

> The claims do not merely recite the abstract idea of filtering content along with the requirement to perform it on the Internet, or to perform it on a set of generic computer components. Such claims would not contain an inventive concept. Nor do the claims preempt all ways of filtering content on the Internet; *rather, they recite a specific, discrete implementation of the abstract idea of filtering content*.

*Id.* at 1350 (emphasis added).

Thus, the *BASCOM* court's focus on the "specific, discrete implementation" of *how* the patent filtered content led it to the inventive concept in the specific architecture of that implementation. The district court erred by failing to fully consider the details of the claims, instead conducting an obviousness-type analysis that "lack[ed] an explanation of a reason to combine the limitations as claimed." *Id.* But the inventive concept inquiry *must* be different than an obviousness-type analysis, which is the exclusive purview of the finder of fact: "The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art. As is the case here, an inventive concept *can be found in the non-conventional and non-generic arrangement* of known, conventional pieces." *Id.* (emphasis added).

This Court recently followed that approach in *Amdocs*, 841 F.3d 1288, where it held that a patent that used known techniques to solve a problem "contains a sufficient 'inventive concept'" to meet the eligibility requirements under step two. *Id.* at 1300. Noting that an analysis of the written description of the various patents-in-suit was critical to understanding the claims, the Court contextualized the problem that the patents were seeking to solve and tethered its analysis to the specifications of those patents. *See id.* at 1300-03. The *Amdocs* court applied the *BASCOM* principle that utilizing known techniques or components does *not*

mandate invalidation at step two if the combination of those techniques is unconventional:

> [T]his claim entails an *unconventional technological solution* (enhancing data in a distributed fashion) to a technological problem (massive record flows which previously required massive databases). *The solution requires arguably generic components, including network devices and "gatherers" which "gather" information.* However, the claim's enhancing limitation necessarily requires that these generic components operate in an unconventional manner to achieve an improvement in computer functionality.

*Id.* at 1300-01 (emphasis added). Accordingly, the Court noted that, "[t]he step-two inquiry is a flexible and fact-specific one focused on whether the claims unduly foreclose future innovation." *Id.* at 1312.

Finally, the temporal lens at step two is also important. Both the Supreme Court and this Court have noted that the assessment of patentability must be made with reference to the state of the art *as of a patent's priority date*. *See, e.g.*, *Alice*, 134 S. Ct. at 2357 (analysis whether techniques in the patent "were *already* 'well known in the art'" (emphasis added)); *Mayo*, 132 S. Ct. at 1298-99 (summarizing controlling law by examining whether a patent's additional steps were "*previously* engaged in by those in the field" or "*already* in use" at the time of the invention (emphasis added)); *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1377-78 (Fed. Cir. 2015) (conducting an extensive analysis of the patent by examining whether methods were "well-understood, routine, and conventional

activity in 1997," which was the patent's filing date); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Assoc.*, 776 F.3d 1343, 1347-48 (2014) (examining whether a feature in the patent "was a routine function . . . at the time the claims were filed").

### B. The '748 Patent Contains an Inventive Concept Because It Uses a Specific, Discrete Implementation of Specific Architecture and Steps in a Nonconventional Way.

When the specific, discrete implementation of express mail notification is examined in the context of the specification, it is clear that the '748 Patent claims subject matter that was not routine or conventional at the time of the invention. Namely, the patent sought to improve express mail notification delivery because then-existing technologies created usability problems for users. The Patent achieved those improvements by employing discrete methods and architecture that were unconventional in express mail delivery notification systems and in paging systems at the time of invention. Instead of arriving at that conclusion, the district court erred at step two in at least two respects. First, it misread the principles in *BASCOM* (and *Amdocs*) by effectively ignoring both the specific structural limitations and steps in the claims and the non-conventional arrangement of those structures and steps. Second, it judged whether the specific structural elements were routine or conventional *today*, not at the time of invention, and in doing so,

relied on non-record evidence that should not have been considered on a motion for judgment on the pleadings.

#### 1. The ’748 Patent contains an inventive concept at step two of the *Mayo*/*Alice* inquiry.

Through the lens of *BASCOM* and *Amdocs*, the ’748 Patent contains an inventive concept because it claims specific structural limitations in an arrangement that was non-conventional at the time of filing. The claimed “wireless page messages” and “paging operations center” each invoke paging technology that uses a connectionless framework, as understood by a person of ordinary skill at the time of the Patent application’s filing in 1996. That fact alone removes those paging components from consideration as generic or merely performing “well-understood,” “routine,” or “conventional” functions.

The “wireless page messages” element links to paging technology through its very name (*i.e.*, “wireless *page* messages”), and the “paging operations center” was construed by the court as “a center that receives and processes information related to an express mailing, and *transmits wireless page messages* to the delivery notification recipient.” Appx1533 (emphasis added). The construction’s inclusion of the term “wireless page message” thus ties the “paging operations center” term to the technical meaning of a “wireless page message.” Further, the’748 Patent’s written description explicitly defines “paging” technology with respect to the patentee’s “paging service provided by Mtel.” Appx4 at 2:18-20. That reference

is key because the step two assessment of claim specificity must be made with reference to the written description. *See, e.g.*, *Amdocs*, 841 F.3d at 1303 ("The collection, filtering, aggregating, and completing steps all depend upon the invention's unique distributed architecture—the same architecture outlined in our earlier analysis of the '065 patent. *An understanding of how this is accomplished is only possible through an examination of the claims in light of the written description*." (emphasis added)).

By linking the "wireless page message" and "paging operations center" to the patentee's commercial wireless paging service, the '748 Patent imparted a specific technical meaning to the term. MTel's infringement expert, Dr. Bims, testified that MTel's "paging" technology at the time of the '748 Patent's filing in 1996 was understood by a person of ordinary skill as referring to the wireless transmission of data via a connectionless framework, as opposed to a connection-oriented framework such as cellular voice or telephonic data transmissions. As Dr. Bims explained:

> In the '96 time frame, cellular networks required that a voice call be established before e-mail messages could be delivered to a mobile user in a -- what was called a connection-oriented network. The wireless paging networks in the '96 time frame used the connectionless technology in which e-mail, fax, and other data could be delivered to the mobile device in a connectionless manner without delivering a voice call first.

Appx881:14-23.

Further, in 1996, MTel was the innovator and sole provider of nationwide, two-way wireless data transmissions using that connectionless data technology. *See* Appx1673; *Mobile Telecommc'ns Techs. Corp.*, 77 F.3d at 1402. As the FCC's Pioneer's Preference Award demonstrates, paging technology was the antitheses of a well-understood, routine, and conventional technology, which at that time was telecommunications including cellular voice and telephonic data transmissions. *See Mobile Telecommc'ns Techs. Corp.*, 77 F.3d at 1402, 1411. Indeed, there is no evidence in the record that the SkyTel network interconnected with an express mail tracking service when MTel launched that network in September 1995. That SkyTel network, and the manner in which it operated, were not conventional or routine at the time of filing.

Similarly, the function of the "express mail tracking service" element and its construction as a "network or service that tracks the delivery status of a package" bears no resemblance to the generic computer components that this Court has previously viewed as insufficient to confer patentability. *See, e.g.*, *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1270 (Fed. Cir. 2016) ("storage medium" and "graphical user interface" were generic computer components). Nor could the express mail tracking service's function be viewed as merely "routine" because of the complexity and specific tasks required of such a system. *See id.* (discussing "routine functions, such as transmitting and receiving signals"); *TDE*

*Petroleum Data Sols., Inc., v. AKM Enter., Inc.*, 657 F. App'x 991, 992-93 (Fed. Cir. 2016) ("storing" and "receiving" were "generic computer functions").

The specific claim limitations of the '748 Patent—alone and in their arrangement—distinguish the '748 Patent from those previously invalidated by this Court, where the claims merely overlaid an abstract idea on top of generic computer functionality. *See, e.g., Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1242-43 (Fed. Cir. 2016) ("The patents can readily be understood as adding conventional computer components to well-known business practices. . . . It is not enough to point to conventional applications and say "'do it on a computer.'"); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016) ("The claims at issue do not require any nonconventional computer, network, or display components, or even a 'non-conventional and non-generic arrangement of known, conventional pieces,' but merely call for performance of the claimed information collection, analysis, and display functions 'on a set of generic computer components' and display devices.").

Even presuming *arguendo* that the "wireless page message," "paging operations center," and "express mail tracking service" elements were generic at the time of filing, their *arrangement* to perform the steps of the claimed method was not. As the *BASCOM* court noted, "an inventive concept *can be found in the non-conventional and non-generic arrangement* of known, conventional pieces."

827 F.3d at 1350 (emphasis added). The '748 Patent is unique in combining two discrete fields—on the one hand, express mail tracking; and on the other, wireless page messaging. As the face of the '748 Patent demonstrates, wireless paging technology was not being used for express mail tracking notifications, and the latter art faced substantial problems from the types of communication technology that it had been utilized for such notifications. Appx4 at 1:23-30.

The non-conventional combination of discrete technologies is expressed in the specific architecture and arrangement of the claim limitations and represented in Figure 2 of the Patent.




***FIG. 2***

As Figure 2 illustrates, the patented method requires that paging data pass through mail tracking components, as when the express mail tracking service

receives a "page number." Conversely, the patented method requires that that mail tracking data pass through paging hardware, as when the multiple indications of package delivery pass into the paging operations center, and the notifications of package delay and delivery pass from the paging operations center. Appx5 at 4:11-29.

Indeed, the district court's definition of "paging operations center" alone demonstrates the non-conventional linkage between those technologies. As "a center that receives and processes information related to an express mailing, and transmits wireless page messages to the delivery notification recipient," that element is charged with combining information from formerly separate technologies—"information related to an express mailing," on the one hand, and "wireless page messages" on the other. Appx34. Furthermore, the claimed steps, themselves, elucidate the non-conventional combination of technologies from disparate fields. The "express mail tracking service," for example, must receive paging information via its receipt of "a page number of a delivery notification recipient." Appx5 at 4:11-14. And the "paging operations center" must receive package tracking information via its receipt of "an appointed time" and a "first indication" and "second indication" of package delivery status. Appx5 at 4:15-22.

Viewed in light of that intrinsic record—as understood by a person of ordinary skill in the art at the time of filing—the'748 Patent's inventive concept

can only be regarded as including non-generic components combined in a non-conventional manner. Moreover, as explained above, the record contained no evidence (the district court did not cite nor did UPS provide any evidence) to suggest that other companies were routinely combining these features in any way to deliver notifications.

### 2. The district court ignored the non-conventional structure and arrangement of the ’748 Patent.

At step two, the district court was required to consider the "specific, discrete implementation" of the claimed invention, including both the technical components and the arrangement of those components. *See BASCOM*, 827 F.3d at 1350; *see also Amdocs*, 841 F.3d at 1300-03. The district court dismissed such a focused inquiry, noting that the inventive concept inquiry "is determined by the quality, not the quantity, of [the patent's] specific adornments and limitations." Appx21. It then engaged in a Section 103-"lite" exercise, making obviousness-type assessments without reference to any specific prior art or explaining any motivation to combine any specific prior art.

The court's justification for its position comes in two parts: its initial justification in the Order granting judgment on the pleadings, and its additional (and somewhat contradictory) justification in the Order denying MTel's Motion for Reconsideration. In the judgment on the pleadings Order, the Court's primary justification for deeming the claim limitations "generic" at step two was that

the'748 Patent includes notifications sent to wireless devices via SMS and wireless email, which the district court regarded as ubiquitous *today*. Appx22-23.

After MTel noted the impermissibility of that hindsight analysis in its Motion for Reconsideration, Appx268, Appx278-287, the court explained that, notwithstanding its discussion of *SMS* and wireless email *today*, the true holding in its original Order was that the claim elements were the "rough equivalent of 'merely generic computers performing routine computer functions.'" Appx33 (emphasis in original). Indeed, the court was dismissive of the temporal restrictions on the rule: "MTel's limitations are generic . . . *regardless of whether assessed now* or from the perspective of someone living in the mid-to-late '90s." Appx34 at n.2. Further, UPS invited such an error, arguing in its Response to MTel's Motion for Reconsideration that Section 101 inquiries are not time-bound, and the inquiry can examine the present-day ubiquity of an invention. Appx306-308.

The court explained that its conclusion was based on its understanding of the plain meaning of "wireless page message"—a claim term that was not offered for construction by either party—and the construction of "paging operations center," which had been construed to include the term "wireless page messages." Appx34 at n.2; Appx1533 ("the Court . . . construes the term 'paging operations center' as

'a center that receives and processes information related to an express mailing, and transmits wireless page messages to the delivery notification recipient'").

According to the court's analysis in its reconsideration order, the plain meaning of "a 'wireless page message' is simply data sent wirelessly, rather than data sent over a 'connection-oriented framework' like a cell phone voice call." Appx34 at 5 n.2. This construction is curious in light of the court's step two analysis because it is a concession by the district court that a "wireless page message" *is not* an unlimited bucket for any and all types of data transmission. Indeed, in its order granting judgment on the pleadings, it had concluded the opposite: that the '748 Patent broadly claimed the equivalent of communications "through a computer" or "over the internet." Appx22. This stands in spite of the fact that the '748 Patent and MTel's expert repeatedly demonstrated that a "wireless page message" is a special type of data message transmitted over a connectionless framework that, in 1996, was how the SkyTel network operated. Appx4 at 2:15-20; Appx108-110 & n.19; Appx881:14-23.

The district court's construction of "wireless page message" to exclude transmissions over a "connection-oriented framework like a cell phone voice call" was correct and should have conclusively established that, by limiting the claims to a particular mechanism for wireless transmission (those utilizing only connectionless frameworks), the claim was neither abstract nor well-understood,

routine, or conventional. *Cf. Affinity Labs*, 838 F.3d at 1269 ("The patent, however, does not disclose any particular mechanism for wireless streaming content to a handheld device.").[7] Contrary to its own analysis and the record evidence, the court nonetheless concluded that "sending wireless page messages was well-known in 1996." Appx34 at n.2. But it had no evidence to support such a conclusion. *See infra* Part II.B.3.

The court also stripped "paging operations center" of its meaning. While the term was construed as "a center that receives and processes information related to an express mailing, and transmits wireless page messages to the delivery notification recipient," the court reduced it to "a center that receives data and then directly or indirectly transmits it wirelessly." Appx34 at n.2. This oversimplification removed from the claim the specific data types that pass through the paging operations center, robbing the term of its nuance and overlooking the "specific, discrete implementation" of the invention. *BASCOM*, 827 F.3d at 1350.

---

[7] The district court defended its analysis by citing *Affinity Labs*, 838 F.3d at 1270, for the proposition that a court may "take note of 'fundamental economic concepts and technological developments' when making a § 101 determination." Appx34 at n.2. However, the technological "findings" in *Affinity Labs* were the prior existence of well-known, commercially-available products—transistor radios and portable televisions. *See* 838 F.3d at 1270. Here, the court's "findings" amount to nothing more than conclusory statements.

The technological nuance of the "paging operations center" demonstrates an inventive concept in two ways. *See supra* Part II.B.1. First, by transmitting wireless page messages, the term invokes the technological import of the SkyTel paging technology that utilized a connectionless framework for message transmission. Second, by combining elements from both express mail tracking and paging, the term highlights the non-conventional combination of discrete technologies. Yet these details were effectively deleted from the claim by the district court's oversimplification.

Similarly, the court's conclusion that the "express mail tracking service" was "known and used at the time of the patent" ignores its combined operation with the paging operations center in the claim. The claims require that the "express mail tracking service" receive paging information via its receipt of "a page number of a delivery notification recipient." Appx5 at 4:11-14. There was no evidence that other companies were routinely sending paging numbers to express mail tracking services for the purpose of delivery status notification.

Finally, the reconsideration Order states that "[i]n combination, these elements are also generic" because "the patent sets forth steps by which conventional technologies . . . do conventional things . . . to achieve an abstract aim." Appx34 at n.2. But the Order lacks any analysis or evidence to support that the combination of elements and the ordered steps of the method itself were routine

or conventional. To the contrary, combining known processes or machines *is* patentable under Section 101. *See BASCOM*, 827 F.3d at 1350; *see also* 35 U.S.C. § 100(b) (defining "process" for the purposes of Section 101 to include "a *new use* of a *known* process, machine, manufacture, composition of matter, or material" (emphasis added). A new use for paging operations centers and wireless page messages by combining them with express mail tracking services is the type of process the Patent Act contemplates.

The consequence of the district courts' reduction of the claims and oversimplification of the claim terms impermissibly strips away the majority of the limitations from the claims:

| **Actual Claim 1** | **Claim 1 As Viewed By District Court** |
|---|---|
| 1. A method for providing notification of an express mail delivery to an addressee thereof, comprising the steps of: | 1. A method for providing notification of an express mail delivery to an addressee thereof, comprising the steps of: |
| sending to an express mail tracking service an ID number assigned to an express mailing and a page number of a delivery notification recipient; | |
| relaying the ID, page number, and an appointed time to a paging operations center; | |
| providing a first indication to the paging operations center that the express mailing has been delivered to the addressee; | |
| providing a second indication to the paging operations center that the express mailing has not been delivered to the addressee by the appointed time; | |
| transmitting, responsive to the first indication, a wireless page message to the recipient as notification of the express mailing delivery; and | transmitting, notification of the express mailing delivery; and |
| transmitting, responsive to the second indication, a wireless page message to the recipient notifying recipient that the express mailing has not been delivered by the appointed time. | transmitting that the express mailing has not been delivered by the appointed time. |

Such a reduction is impermissible under *BASCOM* and *Amdocs*, and the district court's decision should be reversed.

### 3. The district court improperly considered non-record evidence.

In the context of a motion for judgment on the pleadings, the factual universe is limited. First, the assessment of patentability must be made with reference to the state of the art as of a patent's priority date—here, the filing date of the '748 Patent's application. *See supra* Part II.B.1. Second, per Eleventh Circuit law, grant of a Rule 12(c) judgment on the pleadings "may be rendered by considering the substance of the pleadings and any judicially noticed facts." *Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs, Georgia*, 831 F.3d 1342, 1345 (11th Cir. 2016).

The scope of those "judicially noticed facts" is itself limited. *See Thomas v. Sec'y, Florida Dep't of Corr.*, 644 F. App'x 887, 888 (11th Cir. 2016) ("[T]he taking of judicial notice of facts is 'a highly limited process.'"). Judicial notice does not act as a catch-all for any facts and evidence not contained within the record that a court might wish to consider. *See, e.g.*, *Brown v. Brock*, 169 F. App'x 579, 582 (11th Cir. 2006) (vacating grant of JMOP where the district court improperly took judicial notice of a bankruptcy petition). Pursuant to Rule 201 of the Federal Rules of Evidence, a district court may only "take judicial notice of facts that are 'not subject to reasonable dispute,' because they are 'generally known within the trial court's territorial jurisdiction' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be

questioned.'" *Thomas*, 644 F. App'x at 888 (citing Fed. R. Evid. 201). "The reason for this caution is that the taking of judicial notice bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court." *Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197, 1205 (11th Cir. 2004).

This Court specifically considered the issue of judicially noticed facts in the context of a Section 101 motion for judgment on the pleadings in *Affinity Labs v. Amazon*, 838 F.3d 1266. There, the patentee asserted that "the magistrate judge improperly engaged in fact-finding when he stated that the idea of delivering media content to a wireless portable device is one of long standing." *Id.* at 1270. This Court concluded otherwise. Consistent with the Eleventh Circuit and Rule 201's requirement that judicial notice be limited to those facts which were indisputable, this Court explained that, "*It is not debatable* . . . that the delivery of media content to electronic devices was well known long before the priority date of the '085 patent." *Id.* (emphasis added). The Court elaborated that "the practice of taking note of fundamental economic concepts and technological developments in this context is well supported by our precedents." *Id.*

Accordingly, in light of the overlapping requirements between Section 101 analysis and Rule 12(c) analysis, the permissible evidentiary scope of UPS's Motion for Judgment on the Pleadings was limited to: (1) facts that preceded the

filing date of the patent and that were ascertainable from the pleadings; (2) the patent, itself; and (3) "fundamental economic concepts and technological developments" which are "not debatable" and thus amenable to judicial notice. The district court exceeded those evidentiary bounds by considering evidence and taking judicial notice of "facts" that were not only outside the evidentiary record, but contrary to it.

To begin, the district court analyzed the invention based on the hindsight-driven assessment of technology today:

> But it is hard to understand how a "wireless page message" – like a "SMS message or email message" – sent over a "connectionless framework" – like a cellular network or the internet – is anything but generic. (*Id.*) Arguing that something is specific does not make it so. *These technologies and forms of communications are all ubiquitous*.

Appx23 (emphasis added).[8]

---

[8] There is no support in the record for the district court's finding that cellular networks utilized "connectionless frameworks" in 1996 (the priority date of the patent-in-suit). The only record evidence was Dr. Bims' explanation under cross-examination that those networks did not utilize such connections frameworks technology. Appx881-882. Dr. Bims explained that the cellular network technology commercially available in 1996 relied on connection-oriented protocols similar to traditional telephone systems (PSTN) to provide voice calling capabilities to users. *Id*. Second, there was nothing in the record to support the district court's suggestion that the Internet is or was a "wireless" network. The fact that the Internet was not a "wireless" network is the kind of undebatable fact that courts are allowed to take judicial notice of under FRE 201. It is clear that the district court was making findings about the *present* state of the art in which cellular networks have evolved to handle increased

The court even highlighted the *current* availability and popularity of SMS and email in its analysis of the patentability of MTel's invention:

> MTel's patent, by its own terms and under its own arguments, covers a method for delivery notification that could be implemented with generic components, using two of the most popular methods of communication *currently available* in SMS text messages and e-mail.

Appx24 (emphasis added).

That error—judging the invention against the advanced state of technology today—was specifically invited by UPS in its Motion for Judgment on the Pleadings, when it mischaracterized MTel's position and pressed the Court to take a hindsight-driven view of the Patent by considering the invention in light of current technologies:

> Further, if Mtel is allowed to rewrite "wireless page message" to mean "wireless data message" as explained in UPS's Motion for Summary Judgment (D.E. 95), this limitation is wholly generic as Mtel alleges that *any* computing device that has an email address, phone number, or page number associated with it infringes this limitation.

Appx66.

---

wireless data and connect to the Internet by using the type of connectionless frameworks used in the SkyTel paging network. But that evolution did not occur until more recently and the only evidence in the record regarding how modern cellular networks function versus how they functioned in 1996 is Dr. Bims' expert opinion testimony provided under cross-examination. Appx851-855; Appx881-882.

However, the *current* availability and popularity of technology that might be covered by the ’748 Patent *today* is irrelevant to the inquiry. Only the evidence of the state of technology when the ’748 Patent was filed in 1996 is relevant. *Cf. Alice*, 134 S. Ct. at 2357; *Mayo*, 132 S. Ct. at 1298-99; *Ariosa*, 788 at 1377-78; *Content Extraction*, 776 F.3d at 1347-48.

Courts have long warned against the risk of hindsight bias when assessing the validity of patents years after their issuance. More than a century ago, the Supreme Court explained:

> It is often difficult to determine whether a given improvement is a mere mechanical advance, or the result of the exercise of the creative faculty amounting to a meritorious invention. *The fact that the invention seems simple after it is made does not determine the question; if this were the rule, many of the most beneficial patents would be stricken down.* It may be safely said that if those skilled in the mechanical arts are working in a given field, and have failed, after repeated efforts, to discover a certain new and useful improvement, that he who first makes the discovery has done more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor.

*Expanded Metal Co. v. Bradford*, 214 U.S. 366, 381 (1909) (emphasis added); *see also* Appx272-277; Appx278-287.

This Court’s jurisprudence is replete with opinions correcting improper hindsight analysis in other inquiries, revealing the pervasiveness of the risk. *See, e.g., Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 881

(Fed. Cir. 1998); *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1054 (Fed. Cir. 1988); *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 448 (Fed. Cir. 1986); *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143 (Fed. Cir. 1985).

By considering non-record evidence and analyzing the patentability of the '748 Patent in light of its present-day applicability (*i.e.*, the current state of wireless SMS and email delivery technologies), the district court engaged in impermissible hindsight analysis. The fact that more than twenty years ago, MTel Corp. invented technology that utilized techniques (*e.g.*, wireless page messages) that have been widely adopted today proves the Patent's worth, not its failing. *Cf. Expanded Metal*, 214 U.S. at 381.

The district court further exceeded the bounds of what it was allowed to consider by taking judicial notice of "facts" that were not only disputed, but contrary to the evidentiary record. In its Order Denying MTel's Motion for Reconsideration, the district court sought to clarify that "claim terms "wireless page message," "paging operations center," and "express mail tracking service" were generic. Appx34 at n.2.

However, the district court had no evidentiary basis to make those conclusions. Indeed, UPS did not offer any evidence to support the district court's conclusions. Appx304-312. Nor did it present any evidence that such technology

was commonplace in 1996. The district court nonetheless engaged in technical fact-finding without any basis other than its own present-day, hindsight-influenced misconception that the technology was well-understood, routine, and conventional.

To address these issues, the district court should have either denied UPS's motion or converted it to a motion for summary judgment pursuant to Rule 12(d) and solicited additional information from the parties. *See Brown*, 169 F. App'x at 582 ("The district court in this case granted Brock's motion for judgment on the pleadings, but it considered Brown's bankruptcy petition, which we have concluded may not be judicially noticed. Because the court did not provide notice to Brown that Brock's motion was converted to a motion for summary judgment and because the court did not provide Brown with ten days in which to supplement the record, the district court's decision to dismiss Brown's suit must be vacated."). That the district court here did neither is reversible error.

## III. THE DISTRICT COURT ERRED BY RESOLVING THE CASE THROUGH A RULE 12(c) MOTION BECAUSE UPS WAIVED ITS SECTION 101 DEFENSE.

The evidentiary problems enumerated in Part II flow from a more fundamental issue: because UPS waited until the end of this case to file its Motion for Judgment on the Pleadings, when it finally sought to raise the issue, there remained outstanding issues of fact that could not be resolved by the court under Rule 12(c).

A timeline of the key events highlights the gamesmanship of UPS's delay. *Mayo* issued on March 20, 2012, approximately six months before this case was filed. *See Mayo*, 566 U.S. 66. However, at the beginning of the case, UPS did not file a threshold Rule 12 pleading asserting invalidity under Section 101. On February 8, 2013, UPS served its invalidity contentions, which did not assert a Section 101 defense. Appx226-238. Nor did UPS's Amended Invalidity Contentions, served on April 16, 2014. Appx135-151.

On March 13, 2014, MTel sought via contention interrogatory "the factual and legal basis" for UPS's assertions of invalidity. UPS's April 17, 2014 response did not assert invalidity under Section 101. Appx126-127. *Alice* issued on June 19, 2014. *Alice*, 134 S. Ct. 2347. UPS still did not file a Section 101 motion. Nor did it amend its response to MTel's contention interrogatory or its Invalidity Contentions to include Section 101 as a basis of invalidity. *See* Appx125-128; Appx131-151; Appx226-238; Appx1683.

On July 2, 2014, UPS served its expert report on invalidity, which did not assert invalidity under Section 101. Appx155-158; Appx160-163. According to the district court's schedule, dispositive motions were due on October 30, 2014, yet UPS let that deadline lapse without asserting Section 101 invalidity. On July 8, 2015, the Special Master issued his report and recommendation that the court should deny UPS's Motion for Summary Judgment as to literal infringement.

Appx1412-1413. Only after the Special Master recommended that the Court deny UPS's Motion for Summary Judgment, and realizing that it was out of options before trial, did UPS finally move for invalidity under Section 101. Appx1469-1470.

As this Court has observed, there are consequences to a party sitting on its hands, including the waiver of a defense. *See, e.g., O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1366 (Fed. Cir. 2006) (no abuse of discretion in denying motion to amend infringement contentions after three month delay). The waiver of a Section 101 invalidity defense through a party's needless delay is commonplace. *See, e.g., Johnstech Int'l Corp. v. JF Microtechnology SDN BHD*, No. 14-CV-02864-JD, 2016 WL 6836965, at *2 (N.D. Cal. Mar. 10, 2016); *Radware, Ltd. v. F5 Networks, Inc.*, 147 F. Supp. 3d 974, 982 (N.D. Cal. 2015); *Thought, Inc. v. Oracle Corp.*, No. 12-CV-05601-WHO, 2015 WL 5834064, at *8 (N.D. Cal. Oct. 7, 2015); *Ancora Techs., Inc. v. Apple Inc.*, No. 11-CV-06357-YGR, 2015 WL 5728042, at *2 (N.D. Cal. Sept. 30, 2015).

This Court considered a Section 101 defense waiver in *Mortgage Grader, Inc. v. First Choice Loan Services Inc.*, 811 F.3d 1314 (Fed. Cir. 2016), holding that the district court did not abuse its discretion by allowing a late Section 101 defense. The Court noted that the plaintiff was not prejudiced because "[a]t the time Appellees amended their final invalidity contentions, '(1) expert depositions

had not yet occurred, (2) [plaintiff] had its full length of time to prepare rebuttal expert reports, and (3) there was still approximately a month and a half until the close of discovery.'" *Id.* at 1323.

The instant case's facts are distinguishable from *Mortgage Grader*. There, the defendant only delayed two months after *Alice* issued before moving for leave to amend contentions to assert Section 101 invalidity. *Id.* Here, UPS never amended its invalidity contentions or supplemented its interrogatory responses to assert Section 101 invalidity. Instead, it waited over a year after *Alice* (and several years after *Mayo*) before filing its Motion for Judgment on the Pleadings.

The prejudice MTel suffered is also distinguishable from *Mortgage Grader*. There, the plaintiff had ample opportunity after Section 101 was raised to develop the record. UPS, however, filed its *Alice* motion eight months after the close of expert discovery, Appx1544; nine months after the deadline for dispositive motions, Appx1544; and a year after the close of fact discovery, Appx1543, and service of expert reports, Appx1546, Appx1550, Appx1554, Appx1558. Indeed, the parties were on the cusp of trial when UPS filed its motion. *See* Rule 16.4.A of Local Rules of N.D. Ga.; *see also* Fed. R. Civ. P. 12(c) ("After the pleadings are closed—*but early enough not to delay trial*—a party may move for judgment on the pleadings." (emphasis added)). MTel's prejudice is not mitigated by the principle that Section 101 challenges are an issue of law; if the district court is

permitted to evaluate disputed factual assertions regarding the state of the art at the time of invention, the litigants ought to be allowed to avail themselves of the full protections of an orderly process, where defenses and contentions are disclosed and discovery about them may proceed. Here, UPS successfully prevented MTel from developing a full record during discovery regarding the state of the art at the time of the invention, forcing MTel to rely exclusively on evidence submitted in support of its successful opposition to UPS's motion for summary judgment of noninfringement.

That the district court impermissibly relied upon non-record evidence was in part a consequence of UPS's delay and failure to preserve its Section 101 defense. UPS's delay meant that UPS did not provide any evidence of the state of the art at the time of the invention or the plain meaning of "wireless page message" to a person of ordinary skill at the time of the '748 Patent application's filing. UPS did not have any evidence that an express mail tracking service constituted merely generic computer components, or that combining such a service with a paging operations center to provide wireless page messages containing delivery status notifications was known in the prior art, much less so well known that it was conventional or routine at the time of the invention. UPS did not have any evidence that wireless page messages or paging operations centers were "well-understood," "routine," or "conventional" at the time of the invention. And it did

not have any evidence that the arrangement of those claim elements or the order of the method steps was "conventional" or "routine," or even performed by anyone prior to the time of the invention. Consequently, the district court made a sua sponte search for that evidence. Finding none in the pleadings or the patent to support its conclusions, it thus engaged in an impermissible, hindsight-based search for non-record evidence and, led by UPS, considered the state of the art today rather than at the time of the invention.

Although the determination of patentability under Section 101 is a matter of law, this Court has made repeatedly clear that the determination involves subsidiary issues of fact. For example, in assessing computer-implemented limitations at *Alice*/*Mayo* step two, the court must make a factual determination whether the claimed computer functions were "well-understood, routine, [or] conventional." *Alice*, 134 S. Ct. at 2359. The evidence for that inquiry is typically supplied by the patent itself. *See, e.g.*, *BASCOM*, 827 F.3d at 1351 ("The intrinsic record in [*OIP Technologies*] confirmed that the invention was simply the generic automation of traditional price-optimization techniques."); *Intellectual Ventures I*, 838 F.3d at 1317 ("The written description is particularly useful in determining what is well-known or conventional."). Or the evidence may be supplied by a party admission. *See, e.g.*, *Ameranth*, 842 F.3d at 1245 ("Ameranth conceded that it had not invented voice or handwriting capture technology, and that it was known

at the time it filed its applications to use those technologies as ways of entering data into computer systems.”); *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1377 (Fed. Cir.), *cert. denied*, 137 S. Ct. 242, 196 L. Ed. 2d 135 (2016) (“GTG concedes that ‘[t]he general laboratory technique of primer pair amplification of DNA, admittedly, was known as of the Filing Date.’”). Or that evidence may be supplied by the district court taking judicial notice under Fed. R. Evid. 201 of those “fundamental economic concepts and technological developments” that are “not debatable.” *Affinity Labs*, 838 F.3d at 1270.

Ultimately, however, there must be *some* evidentiary basis for the court’s decision, and disputed factual issues may preclude a finding of invalidity pursuant to Section 101. *See, e.g.*, *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097 (Fed. Cir. 2016) (“We have also acknowledged, however, that plausible factual allegations may preclude dismissing a case under § 101 where, for example, ‘nothing on th[e] record . . . refutes those allegations as a matter of law or justifies dismissal under Rule 12(b)(6).’” (quoting *BASCOM*, 827 F.3d at 1352)).

That should have been the outcome here. The district court entertained the late-filed motion on the erroneous belief that UPS’s Section 101 defense “would undoubtedly arise at trial.” Appx1469-1470. That, of course, is flatly wrong: Section 101 inquiries are questions of law to be resolved by the court. *See, e.g.*, *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008) (“Whether a claim is drawn to patent-

eligible subject matter under § 101 is an issue of law."), *aff'd sub nom. Bilski v. Kappos*, 561 U.S. 593 (2010); *see also Mayo*, 566 U.S. at 77-80 (explaining two-part test to be applied by district courts).

Neither the pleadings nor the patent itself provide *any* evidentiary basis for the district court's conclusion that wireless page messages, the paging operations center, or their combination with the express mail tracking service, were well-understood, routine, or conventional at the time of the '748 Patent's invention. Nor did UPS provide any evidence that would allow that conclusion. Instead, MTel provided evidence specifically refuting that conclusion. Faced with, at best, a lack of evidence of what was well-understood, routine, and conventional, the proper recourse for the district court was to deny UPS's motion because the "plausible factual allegations" presented by MTel preclude the finding. *Cf. FairWarning*, 839 F.3d at 1097. Its failure to do so was reversible error.

## CONCLUSION

For the foregoing reasons, MTel respectfully requests that this Court reverse and render the district court's holding that the '748 Patent is invalid under Section 101 of the Patent Act, and allow the remaining infringement and invalidity issues in dispute proceed to trial in the district court.

Respectfully submitted,

*/s/ Daniel R. Scardino*
DANIEL R. SCARDINO
MATTHEW MURRELL
IAN COHEN
REED & SCARDINO LLP
301 Congress Ave., Ste. 1250
Austin, Texas 78701
512-474-2449
dscardino@reedscardino.com

*Counsel for Appellant,*
*Mobile Telecommunications*
*Technologies, LLC*

February 22, 2017

**CERTIFICATE OF SERVICE**

I certify that on February 22, 2017, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system, which will send notification of such filing to all registered participants. Electronic copies of the confidential version of the brief will be emailed to Appellee's counsel of record, and physical copies will be sent to counsel as well.

*/s/ Daniel R. Scardino*
DANIEL R. SCARDINO
REED & SCARDINO LLP
301 Congress Ave., Ste. 1250
Austin, Texas 78701
512-474-2449
dscardino@reedscardino.com

*Counsel for Appellant,*
*Mobile Telecommunications*
*Technologies, LLC*

February 22, 2017

## CERTIFICATE OF COMPLIANCE

This Appellant's Principal Brief complies with the requirements of Federal Rule of Appellate Procedure 32 and Federal Circuit Rule 32:

1. Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B)(i), this Appellant's Principal Brief meets the type-volume limitation because it contains no more than 14,000 words. Specifically, it contains 13,991 words (before redaction), excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2. Pursuant to Federal Rules of Appellate Procedure 32(a)(5)(A) and 32(a)(6), this Principal Brief uses a proportionally spaced serif font of 14-point or larger in a plain, roman style. Specifically, it was written in Microsoft Word 2010 using 14-point Times New Roman.

*/s/ Daniel R. Scardino*
DANIEL R. SCARDINO
REED & SCARDINO LLP
301 Congress Ave., Ste. 1250
Austin, Texas 78701
512-474-2449
dscardino@reedscardino.com

*Counsel for Appellant,*
*Mobile Telecommunications*
*Technologies, LLC*

February 22, 2017

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS


**PATENTS-IN-SUIT**

U.S. Patent No. 5,786,748 .......... Appx1

**JUDGMENTS & ORDERS APPEALED FROM**

Order Granting UPS's Motion for Judgment on the Pleadings, *Mobile Telecommunications Technologies, LLC v. United Parcel Service, Inc.*, No. 1:12-CV-3222-AT, ECF No. 161 (N.D. Ga. Mar. 24, 2016) .......... Appx6

Order Denying MTel's Motion for Reconsideration, *Mobile Telecommunications Technologies, LLC v. United Parcel Service, Inc.*, No. 1:12-CV-3222-AT, ECF No. 171 (N.D. Ga. Oct. 21, 2016) .......... Appx30

Judgment, *Mobile Telecommunications Technologies, LLC v. United Parcel Service, Inc.*, No. 1:12-CV-3222-AT, ECF No. 172 (N.D. Ga. Oct. 21, 2016) .......... Appx40

US005786748A

# United States Patent [19]

Nikolic et al.

[11] Patent Number: 5,786,748

[45] Date of Patent: Jul. 28, 1998

[54] **METHOD AND APPARATUS FOR GIVING NOTIFICATION OF EXPRESS MAIL DELIVERY**

[75] Inventors: **John E. Nikolic**, Pearl, Miss.; **Patrick E. Burns**, Palo Alto, Calif.

[73] Assignee: **Mobile Telecommunications Technologies, Inc.**, Jackson, Miss.

[21] Appl. No.: **807,225**

[22] Filed: **Feb. 28, 1997**

**Related U.S. Application Data**

[60] Provisional application No. 60/012,563, Feb. 29, 1996.

[51] **Int. Cl.**[6] ........................ **H04Q 7/00**

[52] **U.S. Cl.** ........................ **340/311.1**; 340/825.44; 340/313

[58] **Field of Search** ........................ 340/311.1, 825.44, 340/313

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,940,963 | 7/1990 | Gutman et al. | 340/311.1 |
| 5,224,150 | 6/1993 | Neustein | 340/311.1 |
| 5,473,667 | 12/1995 | Neustein | 340/825.44 |
| 5,487,100 | 1/1996 | Kane | 340/825.44 |
| 5,635,918 | 6/1997 | Tett | 340/825.44 |

*Primary Examiner*—Edward Lefkowitz
*Attorney, Agent, or Firm*—Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P.

[57] **ABSTRACT**

To provide prompt notification of delivery of an express mailing to the addressee thereof, the page number of a person to be notified upon delivery of the express mailing is communicated to an express mail tracking network and to an operations center of a wireless paging service. When the paging operations center learns of the delivery, either from the tracking network or from a page message transmitted from the delivery site, the person to be notified is paged by the operations center.

**3 Claims, 2 Drawing Sheets**




DEPOSIT MAIL WITH EXPRESS MAIL SERVICE
10
SEND EXPRESS MAIL ID AND DELIVER NOTIFICATION RECIPIENT (DNR) PAGE NOS. TO TRACKING NETWORK
12
SEND EXPRESS MAIL AND DNR PAGE NOS. TO PAGING OPERATIONS CENTER (POC)
14
POC CHECKS TRACKING NETWORK FOR DELIVERY
16
24
POC TRANSMITS ALARM PAGE TO DNR
UPLOAD DELIVERY CONFIRMATION AND TIME TO TRACKING NETWORK
18
26
READ NOTIFICATION LABEL
28
NOTIFY POC OF DELIVERY
22
POC PAGES DNR
20
SEND PAGE TO PAGING OPERATIONS CENTER

FIG. 1


EXPRESS MAIL SERVICE TRACKING NETWORK
42
45
PAGING SERVICE OPERATIONS CENTER
44
49
43
52
55
EXPRESS MAIL SERVICE TERMINAL
40
47
51
EXPRESS MAIL CARRIER DATA ENTRY PORTABLE TERMINAL
46
EXPRESS MAIL CARRIER PAGER/READER
RECIPIENT PAGER
54
48
50

FIG. 2

# METHOD AND APPARATUS FOR GIVING NOTIFICATION OF EXPRESS MAIL DELIVERY

This application has priority to Provisional Application 60/012,563 filed Feb. 29, 1996.

## FIELD OF THE INVENTION

The present invention relates to telecommunications networks and particularly to a method and system for promptly notifying mailers of express mail deliveries.

## BACKGROUND OF THE INVENTION

Express mail has grown to become a large industry involving numerous service providers, such as the U.S. Postal Service, Federal Express, UPS, and others. Federal Express, for example, has in place a network for tracking express mailings they have been engaged to carry. This tracking network is capable of indicating, on essentially a real time basis, status updates on every express mail package and envelope, i.e., its location, and, if delivered, the time and who signed for the delivery. Status updates are available to Federal Express mail users by calling an 800 telephone number. Federal Express also puts status updates out on the Worldwide Web, and thus this information is also accessible to users via the Internet. However, this tracking network requires action by persons, typically mailers, to determine whether critical express mailings have been successfully delivered to addressees.

## SUMMARY OF THE INVENTION

It is accordingly an objective of the present invention to provide a method and system for giving prompt notifications to concerned parties of the actual delivery of express mailings to intended addressees.

To this end and in accordance with an embodiment of the present invention, there is provided a method for providing notification of an express mail delivery to an addressee thereof, comprising the steps of sending to an express mail tracking service an ID number assigned to an express mailing and a page number of a delivery notification recipient; relaying the ID and page numbers to a paging operations center; providing an indication to the paging operations center that the express mailing has been delivered to the addressee; and transmitting a wireless page message to the recipient as notification of the express mailing delivery.

Additional features and advantages of the invention will be set forth in the description that follows, and, in part, will be apparent from the description, or may be learned from practice of the invention. The objectives and other advantages of the invention will be realized and attained by the apparatus particularly pointed out in the written description and claims hereof, as well as the appended drawings.

It is to be understood that the foregoing general description and the following detailed description are exemplary and explanatory and are intended to provide further explanation of the invention defined in the appended claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and constitute a part of this specification, illustrate embodiments of the invention and, together with the following detailed description, serve to explain the objectives, advantages, and principles of the invention.

In the drawings:



FIG. 1 is a flow chart illustrating various embodiments of the present invention; and

FIG. 2 is a block diagram of an exemplary system for practicing the various method embodiments of FIG. 1.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

In accordance with various embodiments of the method of the present invention illustrated in FIG. 1, a mailing party desiring to express mail a package or envelope goes to a terminal of an express mail service and indicates a need to be notified of the time of delivery of the express mailing to the addressed party (step 10). It will be appreciated that another concerned party(ies) may be designated as the delivery notification recipient. In accordance with a feature of the present invention, the delivery notification recipient(s) is designated by a page number assigned to the recipient as a subscriber to a paging service, such as, for example, Skytel, a global paging service provided by Mtel Technologies, Inc. of Jackson, Miss.

An ID number is assigned to the package or envelope by the express mail service and given to the mailing party. In addition, the express mail ID number and the delivery notification recipient's page number are communicated to the tracking network of the express mail service (step 12) via any suitable data link, e.g., land lines. The tracking network then notifies an operations center of the paging service that one of its subscribers, identified by page number, is to be paged when the express mailing, identified by its ID number, has been delivered (step 14). Commencing on the following day, the paging operations center periodically accesses the express mail tracking network to determine whether the particular express mailing has been delivered (step 16).

When the express mailing is delivered by a carrier of the express mail service to the addressee and signed for, this information, including time of delivery, is shortly thereafter uploaded into the express mail tracking network (step 18) via a suitable data link. Typically the express mail carrier is equipped with a portable data entry terminal including an optical scanner for reading a bar-coded label stuck to the express mailing to enter the express mail ID number. The delivery time and name of the signing party are manually entered via a keypad. Shortly thereafter, these entries are uploaded to the tracking network. Subsequently, when the paging operations center next accesses the tracking network (step 16) using the ID number, it is learned that this express mailing was delivered at a certain time; whereupon the paging operation center transmits a wireless page message to the delivery notification recipient's pager indicating delivery and time (step 20).

Rather than requiring the paging operations center to access the tracking network to determine that the express mailing has been delivered, the tracking network, upon receiving the delivery information uploaded from the carrier's terminal in step 18, may take the initiative and promptly notify the paging operations center of the delivery, as indicated by step 22. The paging operations center then executes step 20.

As an additional feature of the present invention, the paging operations center may transmit an alarm page message to the delivery notification recipient's pager (step 24), if the tracking network indicates that that express mailing has not been delivered by an appointed time. The appointed time may be included in the information sent to the paging operations center in step 14. The delivery notification recipient can then take appropriate action, such as accessing the

tracking network to determine status, notifying the addressee, using alternative means to convey the express mailing contents to the addressee, etc.

As an alternative embodiment of the invention illustrated in FIG. 1, the express mail carrier may be equipped with a portable transmitting pager adapted to include a bar code reader. In this case, an additional bar code notification label indicating at least the express mail ID number, but possibly also the delivery notification recipient's page number, may be affixed to the express mail package or envelope in step 10. Then, when the express mailing is delivered, the carrier, in addition to entering the delivery information into the portable tracking terminal, reads the notification label (step 26) using the reader-pager. A page message including at least the express mail ID number is transmitted to the paging operations center (step 28), which then pages the deliver notification recipient in step 20. In this embodiment, step 16 can be omitted.

FIG. 2 provides a schematic block diagram of an exemplary system for practicing the various method embodiments of the invention illustrated in FIG. 1. Reference numeral **40** indicates an express mail service terminal where the various aspects of step 10 are performed. It will be appreciated that terminal **40** may, in fact, be the mailing party's office. The express mail ID number and delivery notification recipient's page number are communicated to the tracking network **42** over data link **43** and relayed to the paging operations center **44** over a data link **45**. Reference numeral **46** indicates the express mail carrier's portable data entry terminal used to read (as indicated by arrow **47**) the express mail bar-code label **47***a* stuck to the express mail envelope **48** to enter the express mail ID number, which soon thereafter is uploaded to tracking network **42** over data link **49**. Reference numeral **50** represents a transmitting pager-reader for reading (as indicated by arrow **51**) the delivery notification label **51***a* stuck to the package **48** and transmitting the read delivery notification information via a wireless data link **52** to paging operations center **44**. Finally, reference numeral **54** represents the delivery notification recipient's pager which receives the delivery notification page via wireless data link **55**.



Other embodiments of the invention will be apparent to those skilled in the art from consideration of the specification and practice of the invention disclosed herein. It is therefore intended that the specification and drawings be considered as exemplary only, with the true scope and spirit of the invention being indicated by the following claims.

What is claimed is:

1. A method for providing notification of an express mail delivery to an addressee thereof, comprising the steps of:

sending to an express mail tracking service an ID number assigned to an express mailing and a page number of a delivery notification recipient;

relaying the ID, page number, and an appointed time to a paging operations center;

providing a first indication to the paging operations center that the express mailing has been delivered to the addressee;

providing a second indication to the paging operations center that the express mailing has not been delivered to the addressee by the appointed time;

transmitting, responsive to the first indication, a wireless page message to the recipient as notification of the express mailing delivery; and

transmitting, responsive to the second indication, a wireless page message to the recipient notifying recipient that the express mailing has not been delivered by the appointed time.

2. The method according to claim **1** wherein the step of transmitting a wireless page message responsive to the first indication includes the step of transmitting a wireless page message that indicates a time that the express mailing was delivered.

3. The method according to claim **1** wherein the step of transmitting a wireless page message responsive to the first indication includes the step of transmitting a wireless page message that indicates a name of a person that signed for the express mailing.

* * * * *

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| MOBILE TELECOMMUNICATIONS TECHNOLOGIES, LLC, | : | |
| Plaintiff, | : | |
| v. | : | |
| UNITED PARCEL SERVICE, INC., | : | CIVIL ACTION NO. 1:12-CV-3222-AT |
| Defendant. | : | |

**ORDER**

This patent case presents the abstract question of what is meant by the word "abstract." Plaintiff Mobile Telecommunications Technologies, LLC ("Mtel") alleges that Defendant United Parcel Service, Inc. ("UPS") infringed on Mtel's patented method for "provid[ing] prompt notification of delivery of an express mailign to the addressee thereof." (Doc.1-1.) UPS filed a Motion for Judgment on the Pleadings [Doc. 145] arguing that Mtel has attempted to impermissibly patent the abstract idea of "notifying the recipient of an express mailing that the mailing is late" or that "it has been delivered." (Doc. 145-2 at 1 ("Motion").) For the following reasons, UPS's Motion is **GRANTED**.

## I. STANDARD

"Judgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of

the pleadings and any judicially noticed facts." *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998) (citing Fed. R. Civ. P. 12(c)). The legal standard for assessing a motion for judgment on the pleadings is the same as the standard for a motion to dismiss under Rule 12(b)(6). *Id.*; *Roma Outdoor Creations, Inc v. City of Cumming, Ga.*, 558 F. Supp. 2d 1283, 1284 (N.D. Ga. 2008).

This Court may dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A pleading fails to state a claim if it does not contain allegations that support recovery under any recognizable legal theory. 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1216 (3d ed. 2002); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir. 1993). The pleader need not have provided "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

## II. BACKGROUND

Mtel owns United States Patent No. 5,786,748 (the "'748 patent"), titled "Method and Apparatus for Giving Notification of Express Mail Delivery." The patent covers, "*inter alia*, methods for providing notification of an express mail delivery to an addressee via wireless page messages." (Compl. ¶ 13.) More specifically, the patent claims the following:

**1.** A method for providing notification of an express mail delivery to an addressee thereof , comprising the steps of:

> **(a)** sending to an express mail tracking service an ID number assigned to an express mailing and a page number of a delivery notification recipient;
> **(b)** relaying the ID page number and an appointed time to a paging operations center;
> **(c)** providing a first indication to the paging operations center that the express mailing has been delivered to the addressee;
> **(d)** providing a second indication to the paging operations center that the express mailing has not been delivered to the addressee by the appointed time;
> **(e)** transmitting, responsive to the first indication a wireless page message to the recipient as notification of the express mailing delivery; and
> **(f)** transmitting, responsive to the second indication a wire-less page message to the recipient notifying recipient that the express mailing has not been delivered by the appointed time.

**2.** The method according to claim 1 wherein the step of transmitting a wireless page message responsive to the first indication includes the step of transmitting a wireless page message that indicates a time that the express mailing was delivered.

**3.** The method according to claim 1 wherein the step of transmitting a wireless page message responsive to the first indication includes the step of transmitting a wireless page message that indicates a name of a person that signed for the express mailing.

('748 Patent, Compl. Ex. A at 6.)

Case: 17-1422 Document: 20 Page: 86 Filed: 02/22/2017

On September 14, 2012, Mtel filed suit against UPS, alleging that UPS "practices the methods claimed in the '748 patent." (Compl. ¶ 15.) Specifically, Mtel alleges that UPS infringed on the '748 patent by assigning identification numbers to packages it ships and then using said numbers to both "offer[] package tracking services that provide information on the status of a shipment via Short Message Service (SMS)," (Compl. ¶ 16), and provide "information to an intended package recipient including whether there has been a delivery exception, such as when a package delivery has been delayed." (Compl. ¶ 23.)

The Parties proceeded to claim construction, and the Court held a Markman hearing on July 3, 2013. On March 17, 2014, the Court issued its claim construction order. UPS then filed its motion for summary judgment on October 30, 2014, and the Special Master for this case issued his Report and Recommendation on March 25, 2015. On July 29, 2015, UPS filed the present Motion for Judgment on the Pleadings, arguing for the first time that Mtel's patent was invalid under *Alice Corp.*, a 2014 United States Supreme Court case that continued that Court's recent trend of invalidating abstract method patents. While that motion perhaps could have been filed a bit sooner, the Court elected to entertain it given the likelihood that the issue would be raised at trial. (Order, Doc. 148.)

## III. DISCUSSION

The Patent Act provides protection for those who "discover[] any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. This statute has long contained an important exception: "Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (citations and quotation marks omitted). The exception exists because "[l]aws of nature, natural phenomena, and abstract ideas are the basic tools of scientific and technological work," and "[m]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." *Id.*

Of course, "too broad an interpretation of this exclusionary principle [might] eviscerate patent law" because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature . . . or abstract ideas." *Mayo Collaborative Svcs. v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289, 1293 (2012).

Striking the proper balance in identifying those "abstract ideas" that are too ephemeral to be patentable is not an easy task, as courts have repeatedly observed. *E.g.*, *Bilski v. Kappos*, 130 S. Ct. 3218, 3236 (2010) (Stevens, J., concurring) (the Supreme Court has yet to "provide[] a satisfying account of what constitutes an unpatentable abstract idea"); *DDR Holdings, LLC v. Hotels.com*,

*LP*, 773 F.3d 1245, 1255 (Fed. Cir. 2014) ("[d]istinguishing between claims that recite a patent-eligible invention and claims that add too little to a patent-ineligible abstract concept can be difficult, as the line separating the two is not always clear.")

In *Alice Corp.*, the Supreme Court identified a two part test to determine patent eligibility under Section 101. First, a court must first identify if the claim is directed at an abstract idea or other patent-ineligible concept. 134 S. Ct. at 2355. The Court looks at the claim elements both individually and in combination in determining whether a patent is aimed at an abstract idea *Id.* at 2355 n.3; *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) (invalidating a patent where "the concept embodied by the majority of the limitations describes only the abstract idea" of showing an advertisement before providing free content).

Next, the Court must determine if the remainder of the claim adds an "inventive concept" that includes an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more" than the abstract idea itself. *Alice Corp.*, 134 S. Ct. at 2355. "Simply appending conventional steps, specified at a high level of generality," to the abstract idea is not enough to create a patentable invention. *Id.* at 2357.

**A. Abstract Idea**

The Court first addresses whether the '748 patent is directed at an abstact idea. Method patents like the one at issue in this case present "special problems in terms of vagueness and suspect validity." *Bilski*, 561 U.S. at 608. The trick is to try and detect the beating heart of the patent, its animating function. *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1279 (Fed. Cir. 2012) ("It is the management of the life insurance policy that is "integral to each of [Bancorp's] claims at issue," not the computer machinery that may be used to accomplish it.") If that heart is a law of nature or natural phenomenon, "fundamental economic practice," "conventional business practice," or a "method of organizing human activity" that has long been "prevalent in our system of commerce," then the patent is aimed at an abstract idea. *Alice Corp.*, 134 S. Ct. at 2356; *DDR Holdings*, 773 F.3d at 1256.

For example, in *Alice Corp.*, the Supreme Court found that "a method of exchanging financial obligations between two parties using a third party intermediary to mitigate settlement risk" (in essence, using a form of escrow) was a fundamental economic practice "long prevalent in our system of commerce," and therefore an abstract idea that was unpatentable under § 101. 134 S. Ct. at 2356. The Court equated the idea of intermediated settlement with the concept of risk-hedging that was found unpatentable in *Bilski*. *Id*. The patents in *Alice*

*Corp*. or *Bilski* both involved methods of organizing economic activity that were "conventional."

The Federal Circuit and district courts have quickly fallen in line with *Alice Corp*. and its sister cases, and have regularly invalidated a variety of method patents under § 101. In *Intellectual Ventures I LLC v. Capital One Bank*, the Federal Circuit found that a patent for a method of "storing, in a database, a profile keyed to a user identity and containing one or more user-selected categories to track transactions associated with said user identity . . . and causing communication, over a communication medium and to a receiving device, of transaction summary data in the database for at least one or more user-selected categories" was directed towards the abstract idea of budgeting. 792 F.3d 1363, 1367 (Fed. Cir. 2015) (patent aimed at tracking and storing information was directed to patent-ineligible abstract idea of budgeting). Although the patent claimed to implement budgeting using "the Internet and telephone networks," that limitation did not render the claims any less abstract. *Id*.;[1] *see also Bancorp Services*, 687 F.3d at 1278 (Fed. Cir. 2012) (a patent for a method to track, reconcile, and administer life insurance policies was not patent eligible).

And in *Ultramercial, Inc. v. Hulu, LLC*, the Federal Circuit found a patent that recited the process of "receiving copyrighted media, selecting an ad, offering

---

[1] The court also held that a patent for tailoring web content based on a viewer's location or address was unpatentable, as targeted advertising has long been a conventional business practice.

media in exchange for watching the selected ad, displaying the ad, allowing the consumer access to the media, and receiving payment from the sponsor of the ad" all described the "abstract idea of showing an advertisement before delivering free content" which was a long-used conventional business practice and therefore unpatentable. 772 F.3d 709, 715 (Fed. Cir. 2014).

Finally, a number of recent persuasive district court cases have struck down patents under § 101 that are strikingly similar to this one. For example, in *Wireless Media Innovations, LLC v. Maher Terminals, LLC*, 100 F. Supp. 3d 405, 417 (D.N.J. 2015), the court found that a "system for monitoring shipping containers and a computerized system for monitoring and recording location and load status of shipping containers relative to a facility" was not patent-eligible because it was aimed at an abstract idea. Even though the plaintiff argued that the claims were "not limited to the idea of monitoring [shipping] containers in the abstract, but . . . specifie[d] details of how the monitoring is done, including the use of tangible components," the court found that was not enough to overcome the fact that the core of the claim was about a basic organizational business process. *Wireless Media* was recently affirmed in a *per curiam* Federal Circuit opinion. *Wireless Media Innovations, LLC v. Maher Terminals, LLC*, No. 15-1634, --- Fed. App'x ----, 2016 WL 463218 (Fed. Cir. Feb. 8, 2016); *see also Essociate, Inc. v. 4355768 Canada Inc.*, No 14-cv-679, 2015 WL 4470139 (C.D. Cal. Feb. 11, 2015) (patent on the abstract idea of receiving and tracking e-

commerce referrals was ineligible); *GT Nexus, Inc. v. Inttra, Inc.*, No. 11-cv-2145-SBA, 2015 WL 6747142, at *4-5 (N.D. Cal. Nov. 5, 2015) (rejecting a patent claim for "[a]n on-line system and method for buyers and sellers of international container transportation services" for a "single third-party portal for booking" shipment requests with "track and trace" and "event notification" functions because "booking and tracing container shipments through a third party is an abstraction" because the use of a third party intermediary and shipping of goods are established and "conventional business practice[s]"); *MacroPoint, LLC v. FourKites, Inc.*, No. 14-cv-1002, 2015 WL 6870118, at *2-3 (N.D. Oh. Nov. 6, 2015) (patent for "[a] computer implemented method for indicating location of freight carried by a vehicle" consisting of several steps was ineligible because it was directed to the "abstract idea of tracking freight.")

Those few cases cited by the Parties that upheld a method patent typically involved a method whose primary concern (or beating heart) was a specific piece of technology or technological problem. For example, in *SiRF Technology, Inc. v. Int'l Trade Comm.*, 601 F. 3d 1318, 1319 (Fed. Cir. 2010), the Federal Circuit upheld the validity of a patent for a method for "calculating the absolute position of a GPS receiver and an absolute time of reception of satellite signals," because the GPS receiver was "integral to each of the claims at issue." Indeed, ascertaining the position of the receiver was the entire point of the patent (where here, delivery notification is the point). *See also Messaging Gateway Solutions*,

*LLC v. Amdocs, Inc.*, No. 14-cv-737-RGA, 2015 WL 1744343, at *5 (D. Del. Sept. 2, 2015) (patent directed to a problem "unique to text-message telecommunication between a mobile device and a computer . . . [was] tethered to the technology that created the problem.")

There are cases where the distinction between a patent aimed at an abstract idea and one aimed at a specific technological problem will be difficult. But this is not one of them. The method described by the patent has, at its core, one animating goal: notifying customers that their package is late, or that it has arrived. But business practices designed to advise customers of the status of delivery of their goods have ex isted at least for several decades, if not longer. Delivery notification is therefore the kind of conventional business practice long "prevalent in our system of commerce" that *Alice Corp.* found unpatentable. The fact that Mtel has automated the process of delivery notification in a particular way does not, under the circumstances of this case, render the ultimate idea behind its patent different or unique in substance from the general idea itself. 134 S. Ct. at 2350. Other courts have come to the same conclusion in analogous cases. *Essociate, Inc.*, 2015 WL 4470139 (receiving and tracking e-commerce referrals); *GT Nexus, Inc.*, 2015 WL 6747142, at *4-5 (N.D. Cal. Nov. 5, 2015) ("booking and tracing container shipments through a third party"); *MacroPoint, LLC*, 2015 WL 6870118, at *2-3 (abstract idea of "tracking freight.")

As in *Alice Corp.*, Mtel's patent concerns a longstanding "method of organizing human activity." There it was using an escrow; here it is telling someone when their package has arrived. And so the "abstract idea here is not meaningfully different from the ideas found to be abstract in other cases before the Supreme Court and [the Federal Circuit] involving methods of organizing human activity." *Intellectual Ventures*, 792 F.3d at 1367; *see also Wireless Media Innovations*, 100 F. Supp. 3d at 417 (tracking shipping containers is an abstract idea).

**B. Inventive Concept**

Because the Court finds that the '748 patent concerns the abstract idea of providing delivery notification for express packages, it turns to the second part of the *Alice Corp*. test: whether or not the patent contains an "inventive concept" (the "special sauce" of the patent world) that carries it across the threshold of patentability. Unfortunately for Mtel, it does not.

Under *Alice Corp*. and its predecessors, a "claim that recites an abstract idea must include additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." 134 S. Ct. at 2357 (citations and internal brackets and quotation marks omitted). The introduction of a computer or an attempt to limit the use of the idea to a "particular technological environment" is not enough to save the patentability of an abstract idea. *Id*. at 2357-58 ("wholly generic computer implementation is not generally

the sort of "additional featur[e] that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.") Otherwise, "an applicant could claim any principle of the physical or social sciences by reciting a computer system configured to implement the relevant concept," which would hollow out the prohibition on patenting the fundamental and abstract. *Alice Corp.*, 134 S. Ct. at 2359. Similarly, merely reciting "the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet" or a computer is insufficient. *DDR Holdings*, 773 F.3d at 1257. In fact, even the "addition of merely novel or non-routine components to" a claimed idea do not "necessarily turn[] an abstraction into something concrete." *Ultramercial*, 772 F.3d at 715.[2]

Virtually every case discussed above in Section III.A involved a patent implemented on a computer or in a particular technological environment. And by and large, those "limitations" did not save the patents from ineligibility. *Alice Corp.'s* patent for an intermediated settlement process involved a "substantial and meaningful role for the computer." Specifically, the claimed method used a computer to "create electronic records, track multiple transactions, and issue simultaneous instructions." 134 S. Ct. at 2359. It was still deemed ineligible:

---

[2] Courts still consider the pre-*Alice Corp.* "machine or transformation" test as a part of *Alice Corp.'s* second step, but it is no longer sufficient by itself to argue that a claimed method is tied to a particular machine to save a patent from invalidity under Section 101. *Vehicle Intelligence and Safety, LLC v. Mercedes-Benz USA, LLC*, --- Fed. Appx. ----, 2015 WL 9461707, at *4 (Fed. Cir. Dec. 28, 2015) (abstract idea of testing operators of moving equipment for physical or mental impairment is not patentable, despite use of specific "specialized existing equipment modules.")

using a computer to create and maintain shadow accounts was "electronic recordkeeping – one of the most basic functions of a computer." *Id.* at 2359. The claims did not purport to "improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field," *id.*, and so was insufficient to transform the abstract to the patentable. And the patent's recitation of terms like "data processing system," "communications controller," and "data storage unit" were no help either, since such hardware was "purely functional and generic." *Id.* at 2360.

The Court in *Intellectual Ventures* applied *Alice Corp.'s* reasoning to claims for a method for (1) budgeting notifications using "the Internet and telephone networks" and (2) tailoring online advertising content, and rejected both those methods' patentability. 792 F.3d at 1367. The patents included painstaking recitations of just how they would be implemented through technology, but that did not save them from the universe of the unpatentable. *See also Wireless Media Innovations*, 100 F. Supp. 3d at 417 (rejecting patent for tracking shipping containers on a computer); *GT Nexus*, 2015 WL 6747142, at *4-5 (rejecting patent claim for "[a]n on-line system and method for buyers and sellers of international container transportation services" to book and trace shipments); *MacroPoint*, 2015 WL 6870118, at *2-3 (rejecting patent for "[a] computer implemented method for indicating location of freight.")

And in *Ultramercial*, the addition of eleven individual steps to a "method of using advertising as an exchange for currency," including "updating an activity log, requiring a request from the consumer to view the ad, restrictions on public access, and use of the internet" were not enough to transform the abstract idea at the heart of the patent to a patentable method. The *Ultramercial* court made sure to emphasize that attempting to limit the use of an abstract idea to a "particular technological environment" (namely, the internet) was insufficient to preserve patent eligibility. And the fact that "some of the eleven steps were not previously employed [in that art was] not enough" to confer patent eligibility. *Id.* at 716. Judge Mayer's concurrence in *Ultramercial* sums up perhaps the central reason why the Supreme Court has frowned on the patentability of abstract ideas and methods implemented on computers: generic computers and the internet are "the basic tools of modern-day commercial and social interaction," and their use should remain "free to all men and reserved exclusively to none." 772 F.3d 709, 723 (Fed. Cir. 2014) (Mayer, J., concurring).

As discussed above, the only time that in recent cases that courts have upheld a method patent was when the overarching aim of the patent was to solve a specific technical problem, not to implement an abstract idea. *E.g.*, *SiRF*, 601 F.3d at 1332 (the position of a GPS receiver's position was "the precise goal of the claims.") For example, in *DDR Holdings*, the patent at issue involved a method for, in effect, combining websites so that when a user clicked a hyperlink, they

were taken to a hybrid page that combined both the original site and the linked-to site. Although this idea was arguably directed at the idea of a "store-within-a store," which is a conventional business practice, the court found the claims to be limited to addressing particular problems posed by the internet that were not present in the physical world.[3] 773 F.3d at 1258 (finding that the "claimed solution amounts to an inventive concept for resolving this particular Internet-centric problem," but warning that "not all claims purporting to address Internet-centric challenges are eligible for patent"); *Messaging Gateway Solutions*, 2015 WL 1744343, at *5-6 (claim for method of translating SMS text messages to computers was patentable because it involved manipulating a computer in a way that "overrides conventional practice.") In sum, "simply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1300 (2012).

Thus whether or not MTEL has added that special "something more" to this conventional business practice is determined by the quality, not the quantity, of its specific adornments and limitations. Mtel argues that its claims require "specific structures and data elements" such as the "paging operations center,"

---

[3] In a physical "store-within-a-store," a customer remains within the larger store even after they enter the smaller, contained store. In the web context, clicking a link takes the customer away from the original web page – in essence, forcing the customer to walk outside.

"express mail tracking service," "ID number, and "wireless page message[s]," (Doc. 155 at 18), but it offers little in the way of explanation as to how these limitations are actually limiting. For example, it asserts that its method uses a connectionless network, and so excludes "voice communications" – thus "conclusively remov[ing] any preemption concern." (Doc. 155 at 18.) It further objects that its patent does not preempt all delivery status notifications, because UPS could provide those notifications by "having a UPS customer representative call the package recipients on the telephone." (Doc. 155 at 19.) But the implication of Mtel's example is that it has patented a method of delivery notification that is the equivalent of a method implemented "through a computer" or "over the internet." Under this argument, UPS could call customers to advise them of the delivery status of their packages, but could not text them.

The Complaint and Mtel's briefing confirms as much. Mtel alleges that UPS practices the methods specified in the '748 patent by offering "package tracking services that provide information [updates] via Short Message Service (SMS)." (Compl. ¶ 16.) It also argues that "a wireless page message is a specific data format – such as a SMS message or email message – that is transmitted via a connectionless framework." (Doc. 155 at 23.) It insists that this is not "generic data of any form communicated by any means."[4]

---

[4] Mtel also argues that its business leaders' excited "initial reception to the invention" indicates that the limitations in the patent are non-conventional. This argument is not supportable. Great ideas and discoveries are not always (or even often) patentable. Someone could construct

But it is hard to understand how a "wireless page message" – like a "SMS message or email message" – sent over a "connectionless framework" – like a cellular network or the internet – is anything but generic. (*Id.*) Arguing that something is specific does not make it so. These technologies and forms of communications are all ubiquitous.

This case presents claims that are functionally no different from the invalid claims that used the internet in *Ultramercial* and *Intellectual Ventures*. 772 F.3d at 716; 792 F.3d at 1367 ("interactive interface" did not add inventive concept to budgeting tracking); *see also BASCOM*, 107 F. Supp. 3d at 652-53 (patent for internet filtering invalid despite claim that it required use of "special ISP server" and "particular filtering scheme and elements"); *Hewlett Packard Co. v. ServiceNow, Inc.*, No. 14-cv-570, 2015 WL 1133244, at *8-10 (N.D. Cal., March 10, 2015) (claims' use of the terms "container definition nodes," "derived containers," and "repair frames" were insufficient to save a claim for "allowing hierarchical access to [stored] information based on categories of information stored [in a] repository" and "automated resolution of IT incidents," because those seemingly technical terms were in truth generic) (summary judgment). Finally, the steps recited in Mtel's claims represent "insignificant data-gathering steps" like "monitoring, recording, and inputting information" that add "nothing

---

a unified theory of quantum gravity tomorrow to great fanfare and excitement, but that would not make the discovery patentable.

of practical significance" to the abstract idea underneath. *Wireless Media Innovations*, 100 F. Supp. 3d at 416.

And unlike *DDR Holdings* and *SiFR*, Mtel's claims are not directed at a particular technological problem – instead, the claim utilizes technology to achieve its abstract end of delivery notification.

Accordingly, Mtel's patent claims cannot escape the gravity of the pre-emption concerns that figure prominently in *Alice Corp.* and its kin. 134 S. Ct. at 2354 ("We have 'repeatedly emphasized this . . . concern that patent law not inhibit further discovery by improperly tying up the future use of' these building blocks of human ingenuity"); *Ultramercial*, 772 F.3d at 773 (Mayer, J., concurring). Mtel's patent, by its own terms and under its own arguments, covers a method for delivery notification that could be implemented with generic components, using two of the most popular methods of communication currently available in SMS text messages and e-mail. That is the kind of patent *Alice Corp.* was aimed at.[5]

**C. Waiver or Delay**

Mtel also argues that UPS waived its assertion of Section 101 invalidity because it failed to include its Section 101 contentions in its responses to Mtel's interrogatories. Mtel cites case authority for the proposition that a Section 101

---

[5] Mtel argues that patents in the same subclass as the '748 category have rarely been invalidated in the wake of *Alice Corp*. Although it is obvious that business method and software patents form the biggest categories of patents invalidated in the wake of *Alice Corp*., this does not eliminate the fact that Section 101 applies to all patents and is a "threshold" inquiry of eligibility.

invalidity challenge not disclosed early enough during the case is waived. (Pl.'s Resp., Doc. 155 at 7.) But its out-of-district (and out-of-circuit) case authority relied on local rules requiring disclosure of Section 101 challenges near the outset of the case. *See Good Technology Corp. v. Mobileiron, Inc.*, No. 12-cv-5826, 2015 WL 3866019, at *1 (N.D. Cal. May 4, 2015) ("[i]n this district, the rules are clear: a party opposing a claim of patent infringement must include in its invalidity contentions "any grounds of invalidity based on 35 U.S.C. § 101," and citing Patent L.R. 3-3(d), N.D. Cal.; *compare* Patent L.R. 4.3, N.D. Ga. (making no mention of Section 101 challenges or suggesting that undisclosed Section 101 challenges are barred for failure to disclose).

The other case relied upon by Mtel, *Woods v. DeAngelo Marine Exhaust, Inc.*, is also inapposite. 692 F.3d 1272, 1280 (Fed. Cir. 2012). There, the Federal Circuit affirmed a district court's evidentiary decision to exclude engineering drawings produced by the defendant just two months before trial. *Id.* at 1277. These drawings purported to show prior art that anticipated the invention at issue in the case. *Id.* The Federal Circuit held that the defendant's late discovery supplementation was deficient not just because it was late, but also because it failed to adequately respond to the plaintiff's interrogatories requesting identification of "the particular claim being referred to and why such prior art anticipates such claims or renders them obvious." *Id.* at 1282. This failure to respond harmed the plaintiff's ability to "meaningfully challenge [defendant's]

reliance on the drawings as prior art." *Id.* The Federal Circuit emphasized that "[t]he district court has considerable discretion in overseeing compliance with the Federal Rules of Civil Procedure, including discretion to permit [or deny] supplement[ation of] responses to contention interrogatories until theories of the case have ripened for trial." *Id. at* 1280.

*Woods* was thus different from this case in both posture and underlying substance. It dealt with the review of a district court's discretionary discovery ruling, and that ruling concerned a prior art inquiry that was factual in nature. *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1137 (Fed. Cir. 1985) ("the scope and content of . . . prior art, the differences between the prior art and the claimed invention as a whole" are "factual issues" that underlie the legal question of obviousness.) Here, as UPS correctly observes, "Section 101 patent eligibility is a question of law." *In re Roslin I nst. (Edinburgh)*, 750 F.3d 1333, 1335 (Fed. Cir. 2014). Thus, although Mtel argues that it was deprived of the ability to develop a factual record, the Court could have reached the issue presented by UPS's motion before discovery even began. The prejudicial effect of a late disclosure of a Section 101 defense is simply different from the late disclosure of a prior art defense in *Woods*, because the first can potentially be decided without evidence and the latter is often substantially reliant on evidence.

Finally, the Court declines to otherwise bar UPS's motion because of its alleged tardiness, because it already determined it would entertain UPS's motion

in its August 4, 2015 Order. This is because the Motion "raises threshold question of patent validity that would undoubtedly arise at trial." (Doc. 148 at 2.) The Court understands Mtel's frustrations at having to deal with this "threshold" question near the end of its case, but this matter was likely to be heard no matter what, because validity is fundamental to Mtel's ability to recover.

The Court does note, however, that UPS's motion presents a difficult issue on whether to award costs. Both Parties expended significant sums litigating this case, including the expense of paying for a Special Master to issue a Report and Recommendation on summary judgment. Some of those expenses could have been avoided had UPS been quicker to file its Motion. The Court notes that it retains significant discretion to award costs in patent litigation. *Manildra Mill. Corp. v. Ogilvie Mills, Inc.*, 76 F.3d 1178, 1183 (Fed. Cir. 1996) ("the district court judge retains broad discretion as to how much to award, if anything"); *Camacho v. Vertical Reality Inc.*, 210 F. App'x 985, 986 (11th Cir. 2006) (Eleventh Circuit precedent "allows the district court discretion to deny a prevailing party costs . . . [if the order denying costs is] accompanied by a reason for the denial sufficient to allow appellate review of the discretion.") The Parties should consider discussing the issue of costs in conjunction with the Court's directive to discuss settlement, found below.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** UPS's Motion for Judgment on the Pleadings [Doc. 145]. The Court **DENIES** UPS's Motion for Oral Argument [Doc. 146]. Because the Court is granting UPS's Motion for Judgment on the Pleadings, it will not revive UPS's Motion for Summary Judgment. (*See* Doc. 148 (denying without prejudice UPS's Motion for Summary Judgment, but indicating that the Court would revive the motion in the event it denied UPS's Motion for Judgment on the Pleadings.))

The Parties previously requested that the Court grant them an extension to engage in a post-discovery settlement conference after the Court ruled on UPS's motion(s). The Court **DIRECTS** the Parties to discuss in the next twenty (20) days whether or not they wish to engage in further settlement discussions. The Parties are **DIRECTED** to file a status report ("Status Report") on the docket within twenty (20) days of the entry of this Order indicating whether or not they wish to have extra time to discuss settlement (which should include discussing whether or not UPS will seek costs, given the Court's concerns outlined above). The Court **ADMINISTRATIVELY CLOSES**[6] this case, pending hearing from

[6] Administrative closure of a case is a docket control device used by the Court for statistical purposes. Administrative closure of a case does not prejudice the rights of the parties to litigation in any manner. The Parties may move to re-open an administratively closed case at any time.

the Parties regarding if they intend to engage in settlement negotiations.[7] The Court **DEFERS** entering judgment until after it has received the Status Report. The Clerk is **DIRECTED** to submit the Status Report to the undersigned upon its filing.

**IT IS SO ORDERED** this 24th day of March, 2016.

__________________________________
**Amy Totenberg**
**United States District Judge**

[7] Although the Court indicated earlier that it would automatically reopen the case thirty (30) days after issuing an order on UPS's Motion, the Court will decline to do so until it has heard from the Parties on the status of their settlement talks.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| MOBILE TELECOMMUNICATIONS TECHNOLOGIES, LLC, | : | |
| Plaintiff, | : | |
| v. | : | |
| UNITED PARCEL SERVICE, INC., | : | CIVIL ACTION NO. 1:12-CV-3222-AT |
| Defendant. | : | |

# ORDER

Mobile Telecommunications Technologies, LLC ("MTel") moves for reconsideration of the Courts' Order [Doc. 161] granting United Parcel Service, Inc.'s ("UPS") Motion for Judgment on the Pleadings.

MTel filed this suit in 2012, alleging that UPS infringed on MTel's '748 patent, which covered a method to provide "prompt notification of delivery of an express mailing" to an addressee via messages relayed to and from a wireless paging center. After several years of litigation, UPS filed its Motion for Judgment on the Pleadings, arguing that the '748 patent was aimed at the abstract idea of delivery notification and therefore not patentable under 35 U.S.C. § 101.

The Court agreed, holding under the two-step framework provided by *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) that (1) the patent was in fact aimed at the abstract idea of delivery notification and (2) although the

patent limited itself to a "particular technological environment," (Order, Doc. 161 at 12), it did not supply the "inventive concept" needed to render it patentable. *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012).

MTel now argues that the Court "slip[ped] into impermissible hindsight [bias]" (Doc. 164 at 7) when conducting step two of the *Alice Corp*. analysis. Specifically, MTel argues that the Court committed clear error when it observed that "MTel's patent . . . covers a method for delivery notification that could be implemented with generic components, using two of the most popular methods of communication currently available in SMS text messages and e-mail." (Order, Doc. 161 at 19.) According to MTel, the Court was required to examine technology as it existed in 1996 when assessing whether or not the ordered combination of limitations supplied an "inventive concept" rendering MTel's claims patentable.

**I. Standard**

Under Local Rule 7.2(E), "[m]otions for reconsideration shall not be filed as a matter of routine practice," but only when "absolutely necessary." L.R. 7.2(E), NDGa; *Bryan v. Murphy*, 246 F. Supp. 2d 1256, 1258-59 (N.D. Ga. 2003); *Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 916 F. Supp. 1557 (N.D. Ga. 1995) (O'Kelley, J.). Reconsideration should only be granted where there is: (1) newly discovered evidence; (2) an intervening development or change in controlling law; or (3) a need to correct a clear error of

law or fact. *See Smith v. Ocwen Fin.*, 488 F. App'x 426, 428 (11th Cir. 2012); *Bryan v. Murphy*, 246 F. Supp. 2d 1256, 1258-59 (N.D. Ga. 2003); *Jersawitz v. People TV*, 71 F.Supp.2d 1330 (N.D. Ga. 1999) (Moye, J.); *Paper Recycling, Inc. v. Amoco Oil Co.*, 856 F. Supp. 671, 678 (N.D. Ga. 1993) (Hall, J.).

Parties may not use a motion for reconsideration to show the court how it "could have done it better," to present the court with arguments already heard and dismissed, to repackage familiar arguments to test whether the court will change its mind, or to offer new legal theories or evidence that could have been presented in the original briefs. *Bryan v. Murphy*, 246 F. Supp. 2d at 1259; *Pres. Endangered Areas of Cobb's History, Inc.*, 916 F.Supp. at 1560; *Brogdon ex rel. Cline v. Nat'l Healthcare Corp.*, 103 F.Supp.2d 1322, 1338 (N.D. Ga. 2000) (Murphy, H.L., J.); *Adler v. Wallace Computer Servs., Inc.*, 202 F.R.D. 666, 675 (N.D. Ga. 2001) (Story, J.) (citing *O'Neal v. Kennamer*, 958 F.2d 1044, 1047 (11th Cir. 1992)). If a party presents a motion for reconsideration under any of these circumstances, the motion must be denied. *Bryan v. Murphy*, 246 F. Supp. 2d at 1259; *Brogdon ex rel. Cline*, 103 F. Supp. 2d at 1338.

## II. Discussion

MTel argues that the Court engaged in impermissible hindsight bias "by viewing the '748 Patent in light of the ubiquity of wireless messaging technology today," instead of determining whether the limitations in the patent were well-understood, routine, or conventional in the art in 1996, when the patent was filed. (MTel's Motion, Doc. 164 at 7, 18.) MTel contends that "the Order's

analysis of the wireless communications arts in 2016 [is] . . . the *only* basis by which the Order arrives at its conclusion that the '748 Patent fails to contain an inventive concept at Step Two" of the *Alice* analysis. (Motion for Reconsideration. Doc. 164 at 24.)[1] And so, according to MTel, the Court declined to embrace UPS's argument in its Motion for Judgment on the Pleadings that "the claim elements were merely generic computers performing routine computer functions." (Motion for Reconsideration, Doc. 164 at 23.)

The Court is not persuaded. First, MTel cherry picks a few lines from roughly seven pages of the Order's *Alice Corp*. "inventive concept" analysis and from that contends that the entirety of the Court's holding is suspect. It thus misreads and mischaracterizes the Court's holding that MTel has "patented a method of delivery notification that is the equivalent of a method implemented 'through a computer' or 'over the internet.'" (Order, Doc. 161 at 17.) The holding that the claim elements were the rough equivalent of "merely generic computers performing routine computer functions" *was* the Court's holding.

To add to the point, the Court specifically rejected MTel's argument that "its claims require 'specific structures and data elements' such as the 'paging operations center,' 'express mail tracking service,' 'ID number,' and 'wireless page message[s],'" holding that MTel had offered "little in the way of explanation as to how these limitations are actually limiting." (Order, Doc. 161 at 17 (quoting

[1] MTel and UPS both argue over whether or not "novelty" (and thus the state of the art in 1996) is a concept that may be properly explored at Step Two of the *Alice* analysis.

MTel's Response in Opposition to UPS's Motion for Judgment on the Pleadings, Doc. 155 at 18.))[2]

In addition, the Court engaged in a lengthy case analysis surveying Federal Circuit precedent and decisions from other district courts that rejected similar patents for their failure to provide an inventive concept because they all concerned methods for long-known business practices constrained to a "particular technological environment." (Doc. 161 at 13-17, *citing Intellectual Ventures*, 792 F.3d 1363, 1367 (Fed. Cir. 2015); *GT Nexus, Inc. v. Inttra, Inc.*, No.

---

[2] The Court provides a bit more analysis as to why MTel's limitations are generic, individually and in combination, regardless of whether assessed now or from the perspective of someone living in the mid-to-late '90s.

First, a "wireless page message" is simply data sent wirelessly, rather than data sent over a "connection-oriented framework" like a cell phone voice call. (*See* MTel's Response to UPS's Motion for Judgment on the Pleadings, Doc. 155 at 23.) The Court is permitted to take note of "fundamental economic concepts and technological developments" when making a § 101 determination, observes that sending wireless page messages was well-known in 1996. *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, --- F. 3d ----, 2016 WL 5335502, at *4 (Fed. Cir. Sept. 23, 2016) (courts may take notice of fundamental technological developments); *see also In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016) ("use of conventional or generic technology in a nascent but well-known environment" not enough to render abstract idea patentable).

Second, the term "paging operations center" was defined at claim construction as "a center that receives and processes information related to an express mailing, and transmits wireless page messages to the delivery notification recipient." (Order, Doc. 68 at 30.) In other words, it is a center that receives data and then directly or indirectly transmits it wirelessly (here, for the purpose of delivery notification). This too is generic, and the specification offers nothing to obviate that fact.

Finally, the "express mail tracking network" that is accessed by the paging operations center is likewise left vague. The Court construed this term as meaning ""a network or service that tracks the delivery status of a package." (Order, Doc. 68 at 21.) The specification itself recognizes that such networks were known and used at the time of the patent. '748 patent, col. 1 ll. 17-24 ("Federal Express, for example, has in place a network for tracking express mailings they have been engaged to carry. This tracking network is capable of indicating, on essentially a real time basis, status updates on every express mail package and envelope . . . Status updates are available to Federal Express mail users.")

In combination, these elements are also generic. The patent sets forth steps by which conventional technologies (wireless paging systems) do conventional things (relay data and send messages through, in essence, a communications center) to achieve an abstract aim: notifying a customer if and when their package has been delivered.

11-cv-2145-SBA, 2015 WL 6747142, at *4-5 (N.D. Cal. Nov. 5, 2015); *MacroPoint, LLC v. FourKites, Inc.*, No. 14-cv-1002, 2015 WL 6870118, at *2-3 (N.D. Oh. Nov. 6, 2015).)

Nor is the Court persuaded by MTel's citation to more recent Federal Circuit authority. MTel submitted a Notice of Supplemental Authority (Doc. 167) pointing the Court to *Bascom Global Internet Svcs., Inc. v. AT&T Mobility, LLC*, 827 F.3d 1341 (Fed. Cir. 2016). In *Bascom*, the Federal Circuit held that a patent for an internet content filtering system "located on a remote ISP server that associates each network account with (1) one or more filtering schemes and (2) at least one set of filtering elements from a plurality of sets of filtering elements, thereby allowing individual network accounts to customize the filtering of Internet traffic associated with the account." *Id.* at 1345. The defendant argued that the patent was directed towards the abstract idea of filtering content, while the plaintiff argued that the claims of its patent were specifically addressed to a problem "arising in the realm of computer networks, and provide a solution entirely rooted in computer technology." *Id.* at 1346.

The Federal Circuit agreed with the plaintiff, holding that "the invention is not claiming the idea of filtering content simply applied to the internet." *Id.* at 1351. Instead, "[b]y taking a prior art filter solution (one-size-fits-all filter at the ISP server) and making it more dynamic and efficient (providing individualized filtering at the ISP server), the claimed invention represents a 'software-based invention[] that improve[s] the performance of the computer system itself.'" *Id.*

at 1351. The patent therefore slotted into the category of inventions that are patentable. *See Mortgage Grader, Inc. v. First Choice Loan Services, Inc.*, 811 F. 3d 1314, 1325 (Fed. Cir. 2016) (abstract idea of credit grading and facilitating anonymous loan shopping did not contain an inventive concept in part because it did not purport to "improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field.")

By contrast, the claims here "merely provide a generic environment in which to carry out the abstract idea." *In re TLI Communications LLC Patent Litigation*, 823 F.3d 607, 611 (Fed. Cir. 2016). The patent does not claim that MTel invented wireless paging, paging operations centers, or express mail tracking networks. *See Affinity Labs of Texas, LLC v. Amazon.com Inc.*, --- F. 3d ----, 2016 WL 5335502, at *4 (Fed. Cir. Sept. 23, 2016) ("Affinity makes no claim that it invented any of those components or their basic functions, nor does it suggest that those components, at that level of generality, were unknown in the art as of the priority date of the '085 patent.")

The Court instead finds *In re TLI Communications LLC Patent Litigation*, a case supplied by UPS in response to MTel's Notice of Suplemental Authority, to be more analogous. 823 F. 3d at 609-612. There, Federal Circuit held that a patent for "an apparatus for recording of a digital image, communicating the digital image from the recording device to a storage device, and to administering the digital image in the storage device" on a mobile phone was directed "to the abstract idea of classifying and storing digital images in an organized manner."

*Id*. at 609-612. The claims recited the use of a "telephone unit," a "server, an "image analysis unit" and a "control unit" to accomplish the aim of classifying, organizing, and storing digital images. *Id*. at 614. The Court found that the claims' use of these components did not display an inventive combination because the "specification limits its discussion of these components to abstract functional descriptions devoid of technical explanation as to how to implement the invention. For example, the 'image analysis unit' predictably analyzes the digital images to 'determine[] the quality of the digital image provided to the server.'" *Id*. at 615. These "vague, functional descriptions of server components" were "insufficient to transform the abstract idea into a patent-eligible invention." *Id*. In other words, these components were "merely a conduit for the abstract idea of classifying an image and storing the image based on its classification," *id*. at 612, and "the focus of the patentee and of the claims was not on an improved telephone unit or an improved server." *Id*. at 613. The Court recognizes that there are distinctions in the scope of operations addressed by the *TLI* patent's claims. However, *TLI* reinforces the Court's view that it reached the correct result in its March 24, 2016 Order granting UPS's Motion for Judgment on the Pleadings. Like in *TLI*, MTel's specification "fails to provide any technical details for the tangible components, but instead predominantly describes the system and methods in purely functional terms." *Id*. at 612.

Other recent Federal Circuit cases also support this result. In *Affinity Labs of Texas, LLC v. Amazon.com, Inc.*, the court held that a patent that claimed "the

general concept of streaming user-selected content to a portable device" was ineligible for patenting under § 101. *Affinity Labs of Texas, LLC*, --- F. 3d. ----, 2016 WL 5335502, at *5. Notably, *Affinity Labs* contended that its patent "embodied a concrete technological innovation because, as of its priority date (March 28, 2000), wireless streaming of media was not 'routine, conventional, or well known.'" *Id*. at *3. The patent claimed that it used a "network based delivery resource" and a "network based media managing system" with a "customized user interface page for the given user" to facilitate the aim of delivering the content. *Id*. at *5. The court held that these features were "described and claimed generically rather than with the specificity necessary to show how those components provide a concrete solution to the problem addressed by the patent." *Id*. Furthermore, when addressing *Alice* Step One, the Court noted that "essentially result-focused, functional . . . claim language has been a frequent feature of claims held ineligible under § 101." *Id*. at *3 (citations and quotations omitted).

Finally, MTel also cited and attached *Enfish, LLC v. Microsoft Corp*., 822 F.3d 1327 (Fed. Cir. 2016) to its Reply in support of its Motion to argue that the Court erred in determining that the '748 patent was directed towards an abstract idea. *Enfish* provides no help to MTel. In *Enfish*, the Federal Circuit analyzed a patent for an "innovative logical model for a computer database." *Id*. at 1330. The logical model was "[c]ontrary to conventional logical models" because it "include[d] all data entities in a single table, with column definitions provided by

rows in that same table." *Id.* The patents disclosed an indexing technique that allowed for faster searching of data as a result of the database's use of the logical model. The court only engaged in step one of the *Alice* analysis and determined that "the plain focus of the claims is on *improvement to computer functionality itself*, not on economic or other tasks for which a computer is used in its ordinary capacity." *Id.* at 1336. *Enfish* is therefore plainly about a patent whose core aim is improving computer functionality. The '748 patent's core aim is a method for delivery notification, an "economic or other task[] for which a computer is used in its ordinary capacity." *Id.*[3]

## III. Conclusion

For the foregoing reasons, the Court **DENIES** MTel's Motion for Reconsideration [Doc. 164]. The Court **ENTERS** Judgment in favor of UPS and against MTel in this matter.

The Clerk is **DIRECTED** to close[4] this case.

**IT IS SO ORDERED** this 21st day of October, 2016.

**Amy Totenberg**
**United States District Judge**

[3] The Court also finds inapposite *McRO, Inc. v. Bandai Namco Games America, Inc.*, No. 2015-1080, 2016 WL 4896481 (Fed. Cir. Sept. 13, 2016). MIC submitted this case as part of a second notice of supplemental authority. However, the patent at issue there was "directed to a patentable, technological improvement over [] existing, manual 3-D animation techniques." *Id.* at *10.

[4] This matter has previously been administratively closed.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| MOBILE TELECOMMUNICATIONS TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED PARCEL SERVICE, INC.,<br><br>Defendant. | CIVIL ACTION FILE<br><br>NO. 1:12-cv-3222-AT |

**J U D G M E N T**

This action having come before the Court, the Honorable Amy Totenberg, United States District Judge, for consideration United Parcel Service, Inc.'s Motion for Judgment on the Pleadings, and the Court having GRANTED said motion on March 24, 2016, it is

**Ordered and Adjudged** that judgment is entered in favor of United Parcel Service, Inc. for costs of this civil action. This civil action is DISMISSED.

Dated at Atlanta, Georgia this 21st day of October, 2016.

JAMES N. HATTEN
CLERK OF COURT

By: s/ James Jarvis
Deputy Clerk

Prepared and Entered
In the Clerk's Office
October 21, 2016
James N. Hatten
Clerk of Court

By: s/ James Jarvis
Deputy Clerk